**STATE of New York, Plaintiff,**

v.

**KRAFT GENERAL FOODS, INC., Nabisco Cereals, Inc., Nabisco, Inc., Philip Morris Companies Inc., RJR Nabisco Holdings Corp., and RJR Nabisco Inc., Defendants.**

**No. 93 Civ. 0811(KMW).**

United States District Court, S.D. New York.

Feb. 22, 1995.

Richard Schwartz, Gary J. Malone, George Sampson, Beth Farmer, Maria Del Monaco, Timothy Cone, Robert Abrams, Attorney General, New York City, for Plaintiff.

Craig A. Newman, Arnold & Porter, New York City, Abe Krash, Donna Patterson, March Coleman, Brooksley Born, Michael Geske, Steve Reade, Arnold & Porter, Washington, D.C., Theodore L. Banks, Geoffrey Kent, Kraft General Foods Inc., Northfield, IL, for Kraft.

Richard C. Weisberg, Simpson, Thacher & Bartlett, New York City, for Nabisco.

Craig A. Newman, Arnold & Porter, New York City, March Coleman, Arnold & Porter, Washington, DC, for Philip Morris Companies, Inc.

## TABLE OF CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325

I. Relevant Market Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325
 A. Industry Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325
 B. Relevant Geographic Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 326
 C. Relevant Product Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 326
 1. Consumer Dynamics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 326
 2. Retail Customer Perspectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 330
 3. Competition From Products in Other Product Categories . . . . . . . . . . . . . . 331
 4. Supply–Side Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 332
 5. Conclusion: the Relevant Product Market Is All RTE Cereals . . . . . . . . . . . 333

II. Market Share Measurement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335
 A. Actual Shares of Market in 1992 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 335
 B. Measurement of Nabisco Share . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 336
 1. Nabisco was in decline before its acquisition by KKR . . . . . . . . . . . . . . . 336
 2. Shift in Consumer Preferences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 336
 a. Oat bran craze . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337
 b. Taste enhanced cereals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337
 3. Lack of effective advertising and distribution . . . . . . . . . . . . . . . . . . . 337
 4. Lack of full line of products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 337
 5. Harvest strategy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338
 a. "Harvest" limited to marginal brands . . . . . . . . . . . . . . . . . . . . 338
 b. Nabisco continued to support Nabisco Shredded Wheat . . . . . . . . . . . 338
 i. Defense against Kellogg . . . . . . . . . . . . . . . . . . . . . . . . 338
 ii. Trade and consumer promotion spending . . . . . . . . . . . . . . 339
 iii. Reformulation of Spoon Size . . . . . . . . . . . . . . . . . . . . . 339
 iv. Transfer of RTE cereal to the Biscuit Division . . . . . . . . . . . 339

 6. Plaintiff's growth projection for Nabisco is unrealistic . . . . . . . . . . . . . . . . . . . 339
 a. Dissatisfaction of lapsed users . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 339
 b. Plaintiff's erroneous assumptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340
 c. Market share increase due to introduction of new cereals . . . . . . . . . . . 341
 7. Conclusion: Nabisco's 1992 market share accurately reflects its competitive significance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342

III. Likelihood that the Acquisition Will Produce Anticompetitive Coordinated Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342
 A. Dimensions of Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 342
 1. There is No Evidence of Close Coordination in Price . . . . . . . . . . . . . . . . . . . 342
 2. Rubinfeld Pricing Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 343
 3. Retailers' Buying and Pricing Behavior . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 343
 4. Consumer Promotions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 345
 5. Advertising . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 346
 6. New product introductions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 346
 7. Quality improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347
 8. Recent changes in firms' marketing strategies . . . . . . . . . . . . . . . . . . . . . . 347
 9. Competition from private label cereals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 347
 10. Shelving . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 349
 B. Likelihood of Tacit Collusion with respect to Promotion Activities . . . . . . . . . . . . 349
 C. There is No Evidence that RTE Cereal Manufacturers Can, or Do, Punish Competitors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 350
 D. Industry Profitability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 351
 E. Retailers Who Testified Support the Acquisition . . . . . . . . . . . . . . . . . . . . . . . . . . 351
 F. Conclusion of Court–Appointed Expert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 351

IV. Likelihood that the Acquisition Will Product Anticompetitive Unilateral Effects . . . . . 352
 A. Grape–Nuts and Nabisco Shredded Wheat Are Not Each Other's Closest Competitors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352
 1. Grape–Nuts and Nabisco Shredded Wheat Are Physically Dissimilar . . . . . 352
 2. Grape–Nuts and Nabisco Shredded Wheat Are Associated with Different Attributes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352
 3. Grape–Nuts and Nabisco Shredded Wheat Each Compete With a Broad Array of Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 352
 4. Grape–Nuts and Nabisco Shredded Wheat Each Have Direct Form Competitors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 353
 5. Grape–Nuts and Nabisco Shredded Wheat Appeal to Different Consumers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 353
 B. Grape–Nuts and Shredded Wheat Are Priced and Promoted Independently . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 354
 C. Post–Acquisition Pricing and Promotion of Grape–Nuts and Nabisco Shredded Wheat Does Not Support an Inference of Anticompetitive Unilateral Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 356
 D. Expert Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 356
 1. Defendant's Expert's Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 356
 2. Plaintiff's Expert's Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 357

CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

I. The Relevant Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 359

II. Market Shares and Industry Concentration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 361

III. Likelihood of Anticompetitive Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 363
 A. Facilitation of Anticompetitive Coordinated Conduct . . . . . . . . . . . . . . . . . . . . . 363
 B. Promotion of Anticompetitive Unilateral Effects . . . . . . . . . . . . . . . . . . . . . . . . . 365

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 366

*OPINION & ORDER*

KIMBA M. WOOD, District Judge.

Kraft General Foods, Inc. ("Kraft"), which owns Post cereals, entered into an agreement to buy the ready-to-eat ("RTE") cereal assets of Nabisco on November 12, 1992 (the "Acquisition"). The Federal Trade Commission reviewed the Acquisition pursuant to the requirements of the Hart–Scott–Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a. That Act's waiting period expired, without a challenge to the Acquisition, on December 24, 1992, and the Acquisition was consummated on January 4, 1993. Soon thereafter, the Nabisco assets were fully integrated into Kraft's Post Cereals Division.

On February 10, 1993, more than five weeks after the Acquisition was consummated, plaintiff, the State of New York's Attorney General (the "State"), initiated this suit seeking divestiture or recission pursuant to Section 7 of the Clayton Act, 15 U.S.C. § 18, Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y.Gen.Bus.Law §§ 340–344. Much of the procedural background of this case is set forth in the court's Opinion and Order of June 14, 1993, denying the State's first motion for a preliminary injunction. Familiarity with that opinion is assumed. The State maintains that the Acquisition may substantially lessen competition in what the State terms the adult RTE cereal market, or, in the alternative, in the entire RTE cereal market. The State seeks either (1) to rescind the transaction between Kraft and Nabisco, making it possible for Nabisco to reenter the RTE cereal business immediately, or (2) to divest Kraft of Nabisco's assets to another firm ("Newco") that could function in Nabisco's place as the sixth major competitor in the RTE market. By stipulation between the State and Nabisco, the action has been stayed as against Nabisco pending this court's determination of liability.

The State has twice moved for a preliminary injunction enjoining Kraft from implementing a proposed transition between its Post cereal brand and the Nabisco brand. The court denied both of the State's preliminary injunction motions, finding an insufficient threat of irreparable harm. After a three-week liability trial during which the court heard the testimony of Kraft business people; retail grocery chain executives; a Nabisco business person; expert economists for both parties; and the court-appointed, independent expert, Dr. Alfred Kahn; and having evaluated the witnesses' credibility, the exhibits received in evidence, and the parties' legal contentions, the court finds that defendants are entitled to judgment in their favor. The court's findings of facts and conclusions of law supporting that verdict are set forth below.

## FINDINGS OF FACT

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1337(a), and Section 16 of the Clayton Act, 15 U.S.C. § 26. Venue is proper in this district under 15 U.S.C. § 22 and 28 U.S.C. § 1391(c).

I. *Relevant Market Definition*

A. *Industry Overview*

There are over 200 RTE cereal products available for sale to consumers. Kraft currently produces and sells 28 RTE cereal products, 21 under the "Post" name and 7 under the "Nabisco" name. Kraft is permitted to sell the former Nabisco RTE cereal products under the "Nabisco" trademark pursuant to a license that expires in January 1997. Kellogg and General Mills are the two largest manufacturers in the RTE cereal industry, and jointly account for about 60% of all RTE cereal products sold in the United States. Kraft ranks a distant third behind Kellogg and General Mills in the RTE cereal industry. Smith Decl. ¶ 13. In 1992, Kraft accounted for 11.70% of the sales of RTE cereal in the United States. Carroll Decl. ¶ 15; Rubinfeld Decl. ¶ 9(ii)(a), Figure 1 and Table 1. Other branded RTE cereal manufacturers include Quaker, with a 1992 market share of 6.82%; Ralston, with a 1992 market share of 4.58%; and Malt–O–Meal, with a 199*3* share of 1.95% (Malt–O–Meal's market share for the first three quarters of 1994 is 2.3%). Rubinfeld Decl. ¶ 9(ii), Figure 1 and Table 1. Carroll Decl. ¶ 15; Smith Decl.

¶14; DX 251A, Lettmann Dep. at 14–15; DX 251; Leckie Decl. ¶14. There are also several smaller, specialized manufacturers of branded RTE cereal products, including Health Valley and Sunshine Biscuit Co. Boehm Decl. ¶13. Nabisco, with a 1992 market share of 2.82%, was the sixth largest RTE cereal firm and a fairly weak competitor in the RTE cereal market prior to the Acquisition. Boehm Decl. ¶14; Smith Decl. ¶15; Thomas Decl. ¶10; Carroll Decl. ¶15; Rubinfeld Decl. ¶9(ii)(a), Figure 1 and Table 1. Nabisco's main strength was its shredded wheat line of cereals. Thomas Decl. ¶11; Boehm Decl. ¶14; Smith Decl. ¶15. Although shredded wheat cereals are popular, Nabisco's sales had been declining since 1988. Thomas Decl. ¶10; Smith Decl. ¶15.

Private label ("store brand") cereals are a significant and growing presence in the RTE cereal market. See Carroll Decl. ¶15. Private label cereal sales have consistently exceeded the growth of the cereal industry as a whole in recent years. Boehm Decl. ¶16; Smith Decl. ¶24. Gilster–Mary Lee Corp. and Malt–O–Meal Co. produce both branded and private label RTE cereal products, and these companies have grown rapidly in the past few years. Rubinfeld Decl. ¶9(ii)(c); DX 250; DX 251; DX 250A, Welge Dep. at 9–11, 15, 18–19; DX 251A, Lettmann Dep. at 14–15.

Actual market shares of the manufacturers in the industry fluctuated significantly during the period 1988–1993. Carroll Decl. ¶15. Between 1970 and July 30, 1994, there has been a decline in concentration in the RTE cereal industry of about 27 percent. Rubinfeld Decl. ¶60(b); Tr. at 251, 253 (Cotterill).

RTE cereals differ from one another in important respects, including type of grain, degree of sweetness, product form (e.g., flake, nugget, shredded, etc.), texture, flavor, complexity, type of additional ingredients (e.g., nuts and fruit), and perceived health benefits. See Leckie Decl. ¶4; Tr. at 822 (Rubinfeld). RTE cereal consumers demand a particularly high level of variety and new products, and firms in the industry compete with one another by, among other things, introducing a high volume of new products to meet that consumer demand. Carroll Decl. ¶¶17–18, 23.

### B. Relevant Geographic Market

The parties agree that the relevant geographic market in which to analyze the Acquisition is the entire United States. Post products are manufactured in four facilities and are distributed throughout the United States. Leckie Decl. ¶2. The former Nabisco RTE cereal products were manufactured in two facilities and were distributed throughout the United States. Thomas Decl. ¶14. Post sells its RTE cereal products to retailers throughout the United States at a single wholesale price. Leckie Decl. ¶50; Schena Decl. ¶5; Rubinfeld Decl. ¶13(a).

### C. Relevant Product Market

#### 1. Consumer Dynamics

The parties agree that individual consumers have a preference for variety when they choose RTE cereals. See Tr. at 98 (Cotterill). This consumer preference for variety is reflected in the following buying and eating practices. The average household[1] buys about 17 different RTE cereals in the course of a year. Leckie Decl. ¶5; Tr. at 459 (Carroll); DX 42; DX 51 at 5; DX 56 at 19. Most households buy only 25 to 30 percent of their RTE cereal from any one segment of the market. Tr. at 478–79 (Carroll). Seventy-seven percent of RTE cereal purchasers switch products on consecutive purchase oc-

---

1. Although it is conceivable that data concerning purchases by households that contain children and adults is not probative of whether individual cereal eaters would switch from one cereal to another (e.g., adults who prefer plain cereals may buy pre-sweet cereals only for their children and not for themselves), both the State and Kraft rely on household purchasing data, and it appears that it is reasonable to do so. There is evidence that household purchasers make purchase decisions themselves, and are not mere "order-tak-

ers" for others in the household. Carroll Decl. ¶7. These household purchasers take into account such factors as taste, nutrition, general brand image, desire for variety, price, the availability of coupons, and trade promotions. Leckie Decl. ¶¶6, 9, 10; Carroll Decl. ¶24. In addition, there is evidence that once a cereal that is sweetened/flavored and is advertised to children is in a household, it will be eaten by the adults in the household. Carroll Decl. ¶25.

casions. Leckie Decl. ¶ 5; DX 56 at 20. Very few people limit their selection of cereals to one product or one type of product. Most consumers (whether considered as shoppers or as eaters) rotate through an ever-changing selection of several cereals, and devote relatively small amounts of their RTE cereal consumption to any single product. Carroll Decl. ¶¶ 22, 23; Rubinfeld Decl. ¶ 21; DX 47; DX 51. Most consumers express a willingness to try a wide range of cereals. Even the most popular RTE cereals account for only a small percentage of total RTE cereal sales. The best-selling RTE cereal, Kellogg's Corn Flakes, had only a 5.23% market share in 1993. Leckie Decl. ¶ 4; DX 51 at 3. Grape–Nuts, one of Post's most successful products, had only a 2.20% market share in 1993, and had an annual household penetration [2] of only approximately 13%. DX 144 at KGF 1166572; Parker Decl. ¶ 4. Only about one-third of all adults responding in a 1991 survey said they would not eat all types of cereals. Carroll Decl. ¶¶ 23, 45; DX 47 at KGF 0254434.

Most households have a principal shopper who decides which RTE cereals to buy for the entire household. Carroll Decl. ¶¶ 24–25. Purchase decisions are determined by a number of factors, including taste, nutrition, type of grain, sugar content, habit, price and the availability of coupons. Carroll Decl. ¶ 24; Tr. at 570 (Carroll); DX 49 at KGF 0261922. In one survey conducted for Post, consumers ranked price as only the *seventh* most important factor in choosing cereal, behind taste, "brand you usually buy," "nutritious," "family member requested or likes it," "sugar content," "had a coupon," and "type of grain." Carroll Decl. ¶ 24. Consumers are not as loyal to particular RTE cereals as they are to particular brands of other dry grocery products. Leckie Decl. ¶¶ 4–5, 18; Carroll Decl. ¶ 22; Parker Decl. ¶ 4; Thomas Decl. ¶ 63; DX 51 at 4. If one looks at consumption from the standpoint of what percentage of a household's consumption is devoted to a particular cereal, one finds that even the most popular RTE cereals account for only about 10% of the cereal consumption within the households that purchase them—a far lower percentage than is common in other grocery categories. Leckie Decl. ¶ 5; DX 51 at 4. Grape–Nuts accounts for only about 10% of the cereal consumption by its buyers; the remainder of their cereal consumption is widely dispersed among many brands. Leckie Decl. ¶ 18; DX 27 at KGF 1166242–246; *see* Parker Decl. ¶ 4. Even among heavy users of particular products, those products represent a small fraction of their RTE cereal purchases during the year, which accounts for the small "share of requirements" that any one brand fills among its own buyers. DX 47 at KGF 0254426; Carroll Decl. ¶ 23.

Approximately 75% of the buyers of any particular RTE cereal are either "light" or "medium" buyers of that product, meaning that they purchase it less than four times a year. Tr. at 440 (Carroll). On average, 30% of the volume of each RTE cereal is bought by light to medium purchasers. Tr. at 499 (Carroll). Post focuses its marketing efforts mainly on light and medium buyers, in addition to potential new buyers. Tr. at 500 (Carroll). The ability to increase volume sales depends on getting light buyers to purchase more and attracting new buyers. Tr. at 625 (Leckie). Light users disperse their cereal purchases broadly across the range of RTE cereals. Tr. at 626–27 (Leckie); *see* Tr. at 337–339 (Cotterill). Forty to fifty percent of the buyers of a cereal in one year will not purchase that cereal the next year. Tr. at 503–04 (Carroll). When buyers are lost, they are usually the light and medium buyers. Tr. at 500 (Carroll). Light users and non-users are more likely to respond to a price change than are "heavy" users. Tr. at 964 (Rubinfeld); *see also* Tr. at 630 (Leckie).

Individual RTE cereals cannot easily be categorized in terms of the "benefits" they deliver. Many "adult" cereals (*e.g.*, those promoted as "healthy" and high in fiber) actually have as much or more fat and sugar, and fewer vitamins, than many "kid" cereals. Carroll Decl. ¶ 46; DX 65–104; Tr. 67–70 (Cotterill); Tr. 2068–73 (Leckie). Plaintiff's expert concedes that you cannot distinguish

---

**2.** "Household penetration" measures the percentage of cereal-buying households that purchased a particular RTE cereal. Parker Decl. ¶ 4.

one RTE cereal from another on the basis of a single attribute. Tr. at 71 (Cotterill).

Cereal selection is motivated primarily by taste. Tr. at 2075–76 (Leckie); DX 49 at KGF 0261922. Although consumers responding to surveys report a desire for wholesomeness and nutrition, that purported desire is not consistently acted upon if taste is not delivered. Tr. at 563–64 (Carroll).

For comparison purposes, manufacturers of RTE cereal group RTE cereals into subgroups. Different manufacturers have chosen to categorize cereals differently. Rubinfeld Decl. ¶ 54(a). For example, Nabisco used three RTE cereal segments—"adult," "all family," and "kid"—while Post used five segments—"simple health nutrition," "taste enhanced wholesome," "all family basic," "family acceptable kid," and "traditional kid."[3] DX 310 at KGF 0069534; DX 54 at KGF 0261814. Post classified both Grape–Nuts and Nabisco Shredded Wheat as "simple health nutrition" products, while Nabisco classified Grape–Nuts as an "all family" product and Nabisco Shredded Wheat as an "adult" product. Parker Decl. ¶ 11; Rubinfeld Decl. ¶ 54(b); Thomas Decl. ¶ 93; DX 54; DX 310. Nabisco classified many cereals as "all family" that Post classified as "family acceptable kid" or "traditional kid," and that plaintiff, relying on Post's classifications alone, excludes from its "adult" market. Nabisco classified Nabisco Frosted Wheat Squares, Kellogg's Frosted Mini Wheats, General Mills Cheerios (Flavored), General Mills Golden Grahams, General Mills Wheaties Honey Gold, and Quaker Life as "all family," together with, for example, Grape–Nuts, Cheerios and Kellogg's Corn Flakes. DX 310 at KGF 0069534. Plaintiff excludes these products from the "adult" market.

The market segments used by Post to assess the competitive environment of Post products (and the particular products included in a segment) change over time in response to changes in market conditions, consumer preferences, and Post's then-current understanding of RTE cereal competition. Leckie Decl. ¶ 22; Carroll Decl. ¶ 61–62; Tr. at 110 (Cotterill). The former Post market segments did not clearly distinguish between any "kid" and "adult" segments in terms of consumption. Post considered cereals in the "middle"—"family acceptable kid" and "all family basic"—to be consumed by everyone in the household. DX 54 at KGF 0261814; Carroll Decl. ¶ 64. Even the segments at either "end" of the spectrum—"traditional kid" and "simple health nutrition"—were viewed by Post as "primarily," but not exclusively, eaten by children and adults, respectively. DX 54 at KGF 0261814; Carroll Decl. ¶ 64.

The former Post market structure underemphasized the fact that most consumers buy and consume products from all of the categories. Carroll Decl. ¶ 68. For example, Post placed Grape–Nuts in the "simple health nutrition" segment in 1990, but products in the "all family" category accounted for a far larger percentage of Grape–Nuts users' cereal requirements. Leckie Decl. ¶ 23. The five Post market segments on which plaintiff bases its proposed "adult" market definition are no longer used by Post, because, among other things, Post concluded that there is far broader competition among brands than Post's 1990 model recognized. Rubinfeld Decl. ¶ 55; Carroll Decl. ¶ 68.

The evidence does not support plaintiff's claim that there is one group of consumers who eat primarily "adult" cereals and a separate group that eats primarily "kid" cereals. People of all ages generally eat all types of cereal, in varying volumes. Carroll Decl. ¶ 21; Rubinfeld Decl. ¶ 25; DX 35; DX 38. Even plaintiff's expert admitted at trial that adults eat cereals classified by Post as "traditional kid" cereals, and that children eat "simple health nutrition" cereals. Tr. at 37–38, 92–93 (Cotterill). A 1993 study conducted for Post by National Eating Trends

---

3. Because it would be too time-consuming for Post product managers to monitor the competitive activities of over 200 different products, Post's managers focus on a set of products that they believe is sufficient to guide Post's competitive responses. Leckie Decl. ¶ 21; Parker Decl. ¶ 5. These product sets are used mainly to target advertising. Leckie Decl. ¶ 21; Parker Decl. ¶ 5. Cereals included in a competitive set are usually aimed at similar consumers and are perceived by consumers to have similar benefits. Tr. 410–11 (Carroll). However, each cereal also faces competition from a far broader variety of cereals. Tr. 411–13 (Carroll).

("NET"), which looked at individual eating patterns by age over a nine-year period, showed that approximately 70% of children eat "all family cereals," a NET-defined category that includes most of the products that the plaintiff categorized as "adult." Carroll Decl. ¶ 37; DX 40. The same study also showed that approximately 20% of all adults eat "pre-sweet" cereals, which plaintiff generally categorizes as the "kid" market. Carroll Decl. ¶ 37; DX 40. NET has considered consumption in terms of "eating occasions"; their data show that adults account for about 40% of all eating occasions of pre-sweet cereals. Adults account for over 60% of the eating occasions of certain "kid" cereals, such as Frosted Flakes and Golden Crisp. DX 37 at 11. Adults account for 58% of the Honey Nut Cheerios eating occasions, 48% of the Quaker Life eating occasions, and 30% of the Kix eating occasions. Carroll Decl. ¶ 41; DX 37 at 12–13. Looked at from the standpoint of how many adult eating occasions are eatings of pre-sweet cereals, 1991–1994 NET data show that 14.6% of all adult cereal eating occasions were of pre-sweet cereals—18–34 year-olds ate pre-sweet cereals 17.4% of the time; even those over the age of 44 ate pre-sweet cereals about 9% of the time. Carroll Decl. ¶ 38; DX 36.

"Age of Eater" information compiled for Post by HTI (an organization Post used often for home use product testing) in May 1993 from a survey of 50,000 households is consistent with the NET data cited above. Carroll Decl. ¶ 39. It showed that a high proportion of the eaters of "kid" cereals are adults: adults constituted 29% of the reported eaters of Fruity Pebbles; 31% of the eaters of Lucky Charms; 44% of the eaters of Cap'n Crunch; 51% of the eaters of Corn Pops; 62% of the eaters of Golden Crisp; and 67% of the eaters of Frosted Flakes. DX 38. It also showed that large proportions of children ate so-called "adult" cereals: 39% for Cheerios; 34% for Rice Krispies; 23% for Crispix; 15% for Wheaties; 15% for Corn Flakes; 13% for Post Raisin Bran; 7% for Special K; and even 7% for Grape–Nuts and Shredded Wheat. Carroll Decl. ¶ 39; DX 38. Adults over 48 who eat pre-sweet cereals eat such cereals nearly as many times during the week as children do. Carroll Decl. ¶ 40; DX 40.

"Kid" cereals account for 25% of the cereal eaten by those who also ate "all family basic" cereals, 23% of the cereal eaten by those who also ate "taste enhanced wholesome" cereals, and 17% of the cereal eaten by those who also ate "simple/health nutrition" cereals. DX 48 at KGF 0397101. Twenty percent of the time that eaters of "adult" cereals eat cereal, they eat a "kid" cereal. Carroll Decl. ¶ 36. Indeed, these eaters of "adult" eat "traditional kid" cereals twice as often as they eat "family acceptable kid" cereals. Eaters of "all family basic" and "taste enhanced wholesome" cereals eat "traditional kid" cereals as often as they eat "simple health nutrition" cereals. Carroll Decl. ¶ 36. Conversely, those who ate "kid" cereals nearly half the time (45%) also ate "adult" cereals. *Id.*

Based on its 1993 panel data, NET projects that one in four adult RTE cereal eaters eats both "adult" and "kid" cereals. DX 35. The proportion is even higher for children; 50% eat both "kid" and "adult" cereals. *Id.* The other 50% of children fall almost evenly into two categories: those who eat only "adult" cereals and those who eat only "kid" cereals. Carroll Decl. ¶ 43; DX 35.

Sixty percent of households with *no* children purchase both "kid" and "adult" RTE cereals. Carroll Decl. ¶¶ 28, 31; DX 373. Four percent of households without children buy only "kid" RTE cereals. The remaining households with no children (36%) purchase only "adult" products. Carroll Decl. P 31; DX 373.

Households *without* children buy a significant amount, 24%, of the volume of "traditional kid" cereals. Carroll Decl. ¶ 29; Rubinfeld Decl. ¶ 23; DX 39. Households without children buy 24% of the volume of Post Cocoa Pebbles, 23% of Kellogg's Froot Loops, 25% of General Mills Lucky Charms, 35% of Post Golden Crisp, and 25% of Kellogg's Corn Pops—all of which are categorized as "kid" cereals in plaintiff's proposed market definition. Carroll Decl. ¶ 29; DX 39.

Similarly, households without children buy 40% of the volume of "family acceptable kid" cereals. Tr. at 116 (Cotterill). They bought 39% of Kellogg's Frosted Flakes, 39% of Honey Nut Cheerios, 46% of Apple Cinnamon Cheerios, and 53% of Honey Gold Wheaties. Carroll Decl. ¶ 29; DX 39. Households without children bought 53% of Nabisco Frosted Wheat Squares (now Frosted Wheat Bites) and 46% of Kellogg's Frosted Mini–Wheats. Carroll Decl. ¶ 29; DX 39.

Conversely, households *with* children bought 35% of Grape–Nuts Nuggets, 24% of Nabisco Shredded Wheat (Big Biscuit and Spoon Size), 24% of Kellogg's Complete Bran Flakes, 21% of Quaker Puffed Rice and Wheat, 23% of Product 19, and 31% of Special K—all of which were in Post's "simple/health nutrition" segment. Carroll Decl. ¶ 29; DX 39.

Although cereal manufacturers direct some of their advertising for certain sweetened/flavored cereals at children, a cereal's advertising target group is not a reliable test of who eats the cereal. For example, Post classified Golden Crisp as a "traditional kid" cereal, and directed all Golden Crisp advertising to children. However, the HTI Age of Eater Information shows that 62.3% of all eaters of Golden Crisp are 18 and over. Leckie Decl. ¶ 19; DX 38; Tr. at 506 (Carroll). Popular pre-sweetened products, such as Kellogg's Frosted Flakes, Frosted Mini Wheats, and Corn Pops, and General Mills Apple Cinnamon Cheerios, direct separate television advertising campaigns to children and to adults; the time at which they air varies depending on the target group. Leckie Decl. ¶ 19; DX 245; Tr. at 1137–38 (Rubinfeld). Similarly, popular cereals that the State classifies as "adult," such as Kellogg's Corn Flakes and Raisin Bran and General Mills Cheerios, have advertising campaigns that are directed at children, which are separate from the advertising campaigns that they direct at adults. Leckie Decl. ¶ 19.

Consumption of RTE cereals has increased steadily for many years. DX 46; DX 290 at KGF 0130467. Per capita cereal consumption has also increased, whether measured in terms of pounds eaten or in terms of eatings per person. Carroll Decl. ¶ 16; DX 40 at 10;

DX 290 at 0130468. Over ninety percent of all households purchase RTE cereals. Tr. at 425–26 (Carroll); DX 51. Retailers report that RTE cereals are one of their fastest growing sales categories. Smith Decl. ¶ 9; *see also* Boehm Decl. ¶ 7. During the past decade, consumer demand has shifted substantially, from established, relatively plain cereals, including Nabisco Shredded Wheat and Grape–Nuts, to cereals with complex tastes and textures (*e.g.*, cereals composed of a mix of different ingredients, flavors, and forms) as these new products have been introduced by manufacturers. Carroll Decl. ¶ 17; Leckie Decl. ¶ 23; Thomas Decl. ¶ 24. During that time period, cereal manufacturers have introduced many new products in the complex and sweetened/flavored segments of the market. Carroll Decl. ¶ 17; DX 256 at 16, 18–21. The introduction of new products has increased substantially during the past 5–10 years, and is in large part responsible for the growth in consumption in the RTE cereal category. Carroll Decl. ¶ 18; Leckie Decl. ¶ 6; Rubinfeld Decl. ¶ 91; DX 256 at 5; DX 258 at P000557.

### 2. *Retail Customer Perspectives*

RTE cereal manufacturers sell their cereals to retailers, not to consumers. Leckie Decl. ¶ 50; Tr. at 29 (Cotterill). Post does not control the prices that retailers charge consumers for its cereals. Leckie Decl. ¶ 50; Schena Decl. ¶ 6; Smith Decl. ¶ 49; Boehm Decl. ¶ 47; Rubinfeld Decl. ¶ 13(a).

Retailers typically classify all RTE cereals in one category, along with hot cereals, breakfast bars, granola, instant breakfast products, and toaster pastries. Boehm Decl. ¶ 30; Tr. at 1012 (Boehm); Smith Decl. ¶ 31. Retailers usually assign only one category manager or category management team to manage all RTE cereals and the other breakfast products that they classify with RTE cereals. Boehm Decl. ¶ 30; Smith Decl. ¶ 31.

Retailers buy, price, and shelve all RTE cereals together as a single product type. Boehm Decl. ¶ 31; Smith Decl. ¶ 32; Rubinfeld Decl. ¶ 26. Retailers typically place all RTE cereal products in a single aisle of their stores. Smith Decl. ¶ 31; Boehm Decl. ¶ 30; Rubinfeld Decl. ¶ 26. Retailers generally shelve RTE cereals by manufacturer, rather

than by product type. Smith Decl. ¶ 43; Boehm Decl. ¶ 40; Rubinfeld Decl. ¶ 26; Tr. at 681–82 (Smith); Tr. at 29 (Cotterill). Retailers do not distinguish between "kid" and "adult" cereals in allocating shelf space. Boehm Decl. ¶ 40; Smith Decl. ¶ 43; Rubinfeld Decl. ¶ 26; Tr. at 1051–52 (Boehm). Retailers pay little, if any, attention to the marketing "segments" into which RTE cereals are categorized. Leckie Decl. ¶ 20; Boehm Decl. ¶ 31; DX 289.

Retailers choose to carry the cereals that they believe will sell the best. *See* Smith Decl. ¶¶ 40–41; Boehm Decl. ¶¶ 35–37; Tr. at 683 (Smith). All RTE cereals compete with all other RTE cereals, and often with all other breakfast products, for retail shelf space based on each cereal's overall sales performance. Boehm Decl. ¶¶ 30, 37; Smith Decl. ¶¶ 30, 41; Tr. at 1013–1014, 1048–49, 1052 (Boehm). Tr. at 643–44 (Smith). Retailers have noted that, when a particular RTE cereal is promoted, that product's sales will increase, while the sales of all other RTE cereals will tend to decrease. Tr. at 1048–49 (Boehm); *see also* Tr. at 2092–95 (Leckie); DX 389. All RTE cereals, regardless of type, compete with one another for scarce retailer end-aisle display space.

In order to obtain retail feature-priced displays and other trade promotions, every Post or Nabisco RTE cereal, regardless of its classification, must be offered at the same or a lower retail feature price point as all other products competing for retail display promotions and other trade promotions. Leckie Decl. ¶ 30; Tr. 608–10, 613–16 (Leckie).

It is not uncommon to sell twelve times the normal weekly volume in one week when a cereal has a large end-aisle display and an attractive feature price. Tr. at 614 (Leckie); DX 385–389. Thirty percent of Post's cereal sales volume comes through trade deals. For Post to be competitive, Post must convince retailers to accept its trade promotion offers instead of offers made by other manufacturers. In this way, all RTE cereals compete with one another. Tr. at 608–609 (Leckie). If Post is not competitive on its trade promotions and thus does not cause retailers to give it feature ads or store displays, Post

loses a very large volume of sales. Leckie Decl. ¶¶ 12, 30; Tr. at 615, 2063 (Leckie).

### 3. *Competition From Products in Other Product Categories*

RTE cereal products experience some competition at the margin from other product categories. RTE cereals compete to some extent with all other breakfast products. Boehm Decl. ¶ 29; Smith Decl. ¶ 30; Rubinfeld Decl. ¶ 28; Tr. at 1025 (Boehm). Retailers have noted consumer shifts in purchasing among the various products offered on the breakfast aisle. Smith Decl. ¶ 31. Many consumers substitute a broad range of other breakfast food products for RTE cereal. Rubinfeld Decl. ¶ 28; Leckie Decl. ¶¶ 32–33; Thomas Decl. ¶ 65. For example, the data suggest that New York area consumers substitute frozen bagels for RTE cereal. Leckie Decl. ¶ 33.

Many consumers view hot cereal as a substitute for RTE cereal, particularly during the winter months. Leckie Decl. ¶ 32. RTE cereal sales decline overall during the first quarter of each year, and retailers have observed significant seasonal shifting between RTE cereal and hot cereal. Leckie Decl. ¶ 32; Smith Decl. ¶ 31. To take advantage of this, Nabisco promoted Nabisco Shredded Wheat as a hot cereal during winter months, and Post has promoted Grape–Nuts as a hot cereal during January since the mid–1980s. Leckie Decl. ¶ 32; Thomas Decl. ¶ 65; Rubinfeld Decl. ¶ 28(b). Both Spoon Size and Big Biscuit Shredded Wheat have lost substantial volume to hot cereals. One Nabisco document states that over 24% of Spoon Size losses and 50% of Big Biscuit losses went to hot cereals during one period in 1988–89, and that these products lost more volume to hot cereals than they did to Grape–Nuts and other RTE cereal products in what Nabisco characterized as an "adult health non-bran" segment. DX 301 at NBA 0067072–73; Rubinfeld Decl. ¶ 28(b).

In addition to competing against other breakfast foods, RTE cereals also compete against snack foods. Smith Decl. ¶ 30; Tr. at 1065–66 (Boehm).

### 4. Supply–Side Considerations

There is substantial supply-side substitutability among many RTE cereals, including many products inside and outside of plaintiff's proposed "adult" market. Leckie Decl. ¶¶ 25–28; Rubinfeld Decl. ¶ 16.

Most firms in the industry make a wide variety of RTE cereals, using standard manufacturing processes such as flaking, puffing, extruding, granulation, and shredding. These processes are not dedicated to producing cereals in only one marketing segment; rather, the same process is used to make products in various segments. Leckie Decl. ¶ 25; Rubinfeld Decl. ¶ 16. If prices for products in one or more segments were to increase significantly, RTE cereal producers would have an incentive to switch some of their production capacity to produce more of the cereals in those segments. Leckie Decl. ¶¶ 27–28; Rubinfeld Decl. ¶ 16. More specifically, there are a number of different "families" of similar RTE cereals, consisting primarily of an established cereal and its line extensions, where the individual cereals within the "family" are produced by virtually identical manufacturing processes, but fall into different marketing categories. Examples of such "families" include (1) Kellogg's Corn Flakes and Frosted Flakes, (2) Kellogg's Rice Krispies and Cocoa Krispies, (3) Nabisco's Spoon–Size Shredded Wheat and Frosted Wheat Bites, (4) General Mills Cheerios, Honey–Nut Cheerios, Apple Cinnamon Cheerios, and Multigrain Cheerios, and (5) General Mills Wheaties and Honey Gold Wheaties. Some complex products, such as Post's Honey Bunches of Oats, Fruit 'N Fibre, and Blueberry Morning, contain flakes that could be used to make cereals that fall into other marketing categories. Leckie Decl. ¶ 26.

Similar processing methods are used to make both products that plaintiff includes in the "adult" market and products that plaintiff excludes from that market. Rubinfeld Decl. ¶ 17; see also Leckie Decl. ¶¶ 25–28. If prices for cereals in the "adult" market were to increase significantly relative to the prices of other cereals, Kellogg, General Mills, Post and other manufacturers could increase production of "adult" cereals rela-tively quickly and easily by redirecting the use of some portion of the capacity currently used to produce "kid" cereals. Rubinfeld Decl. ¶ 17; see also Leckie Decl. ¶ 27.

This capability is particularly obvious for "pairs" of "adult" and "kid" versions of essentially the same product. For example, Kellogg could switch from production of Cocoa Krispies to regular Rice Krispies; General Mills could switch from Honey–Nut Cheerios and Apple Cinnamon Cheerios to regular Cheerios; and Post could switch from Frosted Wheat Bites to Spoon Size Shredded Wheat in a few days, without incurring any costs, if there were a business reason to do so. Leckie Decl. ¶ 27. The switch could be completed in a matter of days, at little or no cost, for many cereals. More generally, manufacturers using a particular process—such as flaking—to produce "kid" cereals could readily use their existing capacity to produce more cereals in the "adult" segment. For example, Kellogg could immediately shift from producing Frosted Flakes to producing any of its "adult" flaked cereals, including Kellogg's Corn Flakes, Product 19 and Special K. Rubinfeld Decl. ¶ 18. Post could quickly and inexpensively shift from producing its complex adult and all family cereals that contain sweetened flakes to producing the same cereals with unsweetened flakes. Leckie Decl. ¶ 27. Post could also, at no cost, quickly shift from making Fruity Pebbles and Cocoa Pebbles to making a basic crispy rice product. Id. Post could shift from producing Alpha–Bits or Marshmallow Alpha–Bits to producing an unsweetened, toasted oat type "adult" product in approximately two to three months, at a cost of about $50,000 for the equipment needed to extrude the new product in a different shape. Id.

Conversely, Post also could convert assets now used to make "adult" cereals to the production of "kid" cereals. For example, if Post believed that it could increase profits by shifting from producing the Toasties line to producing a sweetened frosted flake product, it could do so almost immediately, at no cost, because the equipment used to produce Toasties already has coating and drying

equipment associated with it. Leckie Decl. ¶ 28. (Leckie).

### 5. *Conclusion: the Relevant Product Market Is All RTE Cereals*

RTE cereals are so highly differentiated, and compete with one another along so many different dimensions, that there is no clear break in the chain of substitutes among cereals that would permit definition of a market smaller than all RTE cereals. Tr. at 828–9, 1400 (Rubinfeld); Tr. at 1394–97 (Falk). Consumers buy and eat a wide variety of RTE cereals. Any substantial price increase for any one type of RTE cereal would lead to significant demand-side substitution of many other RTE cereals. Rubinfeld Decl. ¶ 20. For example, cereals representing large shares of Grape–Nuts buyers' requirements directly affect the pricing and marketing of Grape–Nuts, and vice versa. *See* Parker Decl. ¶¶ 8, 34. Consequently, the pricing and marketing strategies of Grape–Nuts are affected by a wide spectrum of products. Rubinfeld Decl. ¶ 21. In addition, an increase in the prices of products in one market segment would lead to the supply-side substitution by manufacturers referred to above.

Although the calculation of cross-price elasticities of demand does not in and of itself provide a market definition, it does provide information relevant to assessing whether a proposed market definition is or is not reasonable. Rubinfeld Decl. ¶ 44. In this case, cross-price elasticities confirm that there is demand-side substitution between cereals inside and cereals outside plaintiff's proposed "adult" market. Rubinfeld Decl. ¶ 24. There is a consistent and "robust" pattern of statistically significant positive cross-price elasticities among cereals in each of the five Post marketing segments. Rubinfeld Decl. ¶ 31.

The cross-price elasticities calculated by Professor Rubinfeld are significant for many cereals across a wide range of market segments. Rubinfeld Decl. ¶ 32; Appendix 4 Regressions; Tr. at 954–5 (Rubinfeld). To take just one example, Grape–Nuts has a statistically significant cross-price elasticity with Kellogg's Frosted Mini Wheats, and Frosted Mini Wheats has statistically significant cross-price elasticities with other "adult," "family acceptable kid," and "traditional kid" cereals. Rubinfeld Decl. ¶ 21 n. 10 and Appendix 4, Regression 1.

Cross-price elasticity is a more useful tool than own-price elasticity in defining a relevant antitrust market. Cross-price elasticity estimates tell one where the lost sales will go when the price is raised, while own-price elasticity estimates simply tell one that a price increase would cause a decline in volume. Tr. at 929–30 (Rubinfeld).

Plaintiff's economist, Ronald W. Cotterill, relied on several types of Post data, as well as an econometric analysis, in forming his opinion that the relevant product market should include only "adult" RTE cereals. The "brand interaction indices" that he relied upon do not measure the degree of substitutability between products. Rubinfeld Decl. ¶¶ 22, 29–32. Interaction indices show only the extent to which a given cereal contributes to the total volume of cereal purchased by consumers of another cereal relative to the first cereal's share of market during a given period. Carroll Decl. ¶ 9; *see* Tr. at 120–21 (Cotterill). Interaction indices do not show "switching" patterns over time; nor do they relate consumption patterns to price changes or other factors, such as promotions or advertising. Interaction indices measure only the propensity of households to purchase two products. Interaction indices are not equivalent to, or proxies for, cross-price elasticities, because they do not purport to measure changes in consumption as a function of changes in price. Carroll Decl. ¶ 9; Tr. at 416–17 (Carroll); *see* Tr. at 119–20 (Cotterill); Tr. at 960 (Rubinfeld). With respect to RTE cereals, where there are hundreds of brands and no one brand has more than a tiny share of the market, interaction indices have limited significance. Carroll Decl. ¶ 12. Post does not rely exclusively on interaction indices to make major business decisions. Interaction indices are simply one piece of information provided to Post once a year. Tr. at 409–410 (Carroll).

To the extent that plaintiff's expert relies on interaction data, the data do not support his suggested market definition. In fact, interaction data show that buyers of "kid" cereals are nearly as likely to buy "adult"

cereals as are buyers of RTE cereals generally. DX 31; Carroll Decl. ¶ 32. For example, Nabisco Frosted Wheat Squares, which plaintiff categorizes as an "adult" cereal, actually has higher interaction indices with the "traditional kid" (106) and "family acceptable kid" (144) segments, looked at as a whole, than with any of the "adult" segments. DX 30. The same is true for Kellogg's Frosted Mini–Wheats, which plaintiff also includes in its "adult" market, which has a 163 interaction index with the "family acceptable kid" segment and a 142 interaction index with the "traditional kid" segment as a whole. DX 30. Plaintiff's reliance on interaction indices to define distinct "kid" and "adult" markets is misplaced. Interaction indices do not demonstrate any clear dividing line between "kid" and "adult" products. Carroll Decl. ¶ 34.

Professor Cotterill also relied on "shifting studies" performed for Post. *See* Cotterill Aff. ¶¶ 28–30. Shifting studies provide information about purchases from one period to the next, but they do not identify the factors that led to those changes. Carroll Dec. ¶ 49. They do not relate changes in consumption to changes in price, to changes in promotional activity, to changes in advertising, or to other factors that may affect purchasing. Carroll Dec. ¶ 49.

In fact, shifting data indicate that a high proportion of the volume shifting that occurred in the RTE cereal market between 1992 and 1993 was among market segments, especially between so-called "adult" ·and "kid" segments. A Nielsen analysis found, for example, that 71% of shifting gains and losses experienced in the "traditional kid" segment occurred with the "adult" segments of the market, compared to 26% with the "family acceptable kid" segment. Conversely, each of the "adult" segments experienced substantial exchanges of volume with the "kid" segments: 48% with the "all family basic" segment, 45% with the "taste enhanced wholesome" segment, and 35% with the "simple health nutrition" segment.

It is not appropriate to use, as plaintiff's expert has done, the marketing segments adopted from time to time by any particular RTE cereal producer to define a relevant economic product market. Rubinfeld Decl. ¶ 53. The market segments that Post managers use in analyzing the performance of particular products do not define the scope of competition for those products. Leckie Decl. ¶ 21; Tr. at 605 (Leckie); Carroll Decl. ¶ 64; Tr. at 412–13 (Carroll).

In a differentiated product market such as the RTE cereal market, the decision whether to include a product in the market is inevitably somewhat arbitrary, because not all products in a relevant market compete equally with all other products. In such a market, any market definition is likely to exclude some products that are reasonable substitutes for products that are included in the market. Whether such errors of inclusion or exclusion are significant depends in part on the relevant cross-price elasticities of demand between the individual products. Professor Cotterill's suggestion that cross-price elasticities are not relevant (Cotterill Aff., Exhibit C, p. 11) is incorrect.

Professor Cotterill failed to provide a consistent and persuasive methodological basis for deciding which RTE cereal products to include in his "adult" market. Professor Cotterill's model employed a three-stage decision tree for RTE cereal purchase choices: (1) whether or not to buy a RTE cereal; (2) whether to buy an "adult" cereal or a "kid" cereal; (3) whether to buy a particular cereal within a segment. Professor Cotterill's assumptions about purchase and decision-making behavior are unreliable, because they are biased. Tr. at 1394–1407 (Falk); Tr. at 2349 (Kahn). For example, Professor Cotterill's model merely *assumed* that an increase in the price of Grape–Nuts or Nabisco Shredded Wheat (or any other "simple health nutrition" cereal) will have no direct effect on products in other marketing segments. Rubinfeld Decl., Appendix 6. His model was biased in favor of finding very low cross-price elasticities between "adult" and "kid" cereals. Tr. at 973 (Rubinfeld); Tr. at 1394–1407 (Falk). Professor Cotterill's conclusion that the demand for "adult" cereals is relatively inelastic is at odds with empirical evidence concerning cross-price elasticities and other credible evidence in this case. *See, e.g.,* Parker Decl. ¶¶ 11–12, 14; Carroll Decl. ¶¶ 21,

56. Moreover, survey data do not support the notion that consumers consistently follow the decision tree structure used by Professor Cotterill. Tr. at 987 (Rubinfeld).

Professor Cotterill's estimated price elasticity of demand analysis was flawed also because it did not consider the likelihood of a supply response, that is, it does not consider the likelihood that a cereal manufacturer will shift production from "kid" to "adult" cereals (or vice versa). A price increase that would be profitable absent a supply response may well be unprofitable if potential supply responses are taken into account. Tr. at 1194–1196 (Rubinfeld).

The independent economic expert appointed to assist the court, Alfred E. Kahn,[4] concluded on the basis of all the evidence presented at trial that the relevant product market in which to assess the competitive significance of the Acquisition is all RTE cereals. Tr. at 2359 (Kahn). Professor Kahn based his conclusion in part on his views that (1) there is no clear break in the chain of substitutes among RTE cereals, and (2) the chain of substitutes for RTE cereals is not along straight, unidirectional lines radiating out in a uniform and orderly manner. Tr. at 2340 (Kahn). Professor Kahn also expressed the view that any market definition and any measure of market concentration that ignores the dynamic aspects of changing demands for RTE cereal would produce misleading results. Tr. at 2352–54, 2359 (Kahn). Professor Kahn concluded that "the proper market has to be the whole RTE cereal [market] because that is the locus of the competition of the particular kinds that seem to be so important in this industry." Tr. at 2359 (Khan). The court agrees with his conclusions.

## II. Market Share Measurement

### A. Actual Shares of Market in 1992

In 1992, the market shares of the major RTE cereal manufacturers, as reported in Nielsen Scantrack data,[5] were:

| | |
|---|---|
| Kellogg | 37.03% |
| General Mills | 25.12% |
| Post | 11.70% |
| Quaker | 6.82% |
| Ralston Purina | 4.58% |
| Nabisco | 2.82% |
| Private label/Generic | 8.52% |
| Other | 3.40% |

Carroll Decl. ¶ 15; Rubinfeld Decl. ¶ 9, Figure 1. These market shares provide an accurate measure of concentration in the industry. Rubinfeld Decl. ¶ 66; *see also* Rubinfeld Decl. ¶¶ 61–65.

The 1994 partial year market shares relied on by plaintiff are not an accurate measure of the competitive significance of the firms in the industry. Leckie Decl. ¶ 11 n. 2. General Mills suffered a contamination problem

---

**4.** The court appointed an expert economist to assist the court, with defendant's consent, and over plaintiff's objection. The court elicited from each party a list of experts acceptable to that party. Professor Kahn's name appeared on the list submitted by plaintiff. The court acknowledges here his extraordinarily valuable contribution to the case, and that of his colleagues Linda McLoughlin and Jonathan Falk.

**5.** Nielsen Scantrack reports retail grocery sales, including RTE cereal sales, collected by the A.C. Nielsen Company from a sample of retail grocery stores representative of marketplace and chain ACV ("all commodity volume") of retail grocery stores with over $2 million in annual sales. Although Nielsen estimates that its sampling technique accounts for approximately 80% of retail grocery sales, Nielsen Scantrack does not include retail grocery sales at outlets with less than $2 million in annual sales, nor does it include sales of RTE cereals by non-grocery retail outlets, such as convenience stores (*e.g.*, Seven–Eleven), "mom and pop" stores, warehouse/club stores (*e.g.*, Cosco/Price Club), mass merchandisers (*e.g.*, K Mart), military or other institutional outlets, and food service entities. Notwithstanding this deficiency, it is reasonable to rely on such data because Post and other RTE cereal manufacturers rely on it as among the best available indicators of company and brand shares of market. Carroll Decl. ¶ 7(a).

earlier in 1994 that had a dramatic, but probably temporary, depressing effect on General Mills sales during the second quarter of 1994. The 1994 year to date market shares data used by plaintiff therefore understate the significance of General Mills. Leckie Decl. ¶ 11 n. 2. Market share data that exclude the fourth quarter of a year are distorted because they are likely to understate Ralston's market share; Ralston's Chex products sell a disproportionate amount of their volume during the fourth quarter each year, when they are promoted as a holiday snack food. Leckie Decl. ¶ 11 n. 2; Rubinfeld Decl. ¶ 60 n. 27; see also Tr. at 1066 (Boehm).

The pre-acquisition Herfindahl–Hirschman Index ("HHI") for the RTE cereal market was 2215; the increase in the HHI resulting from the Acquisition is approximately 66 points. Rubinfeld Decl. ¶ 60 and ¶ 9 n. 2 Table 1. Concentration in the RTE cereal industry declined between 1970 and 1992. In 1970, the HHI for the RTE cereal industry was about 2955. By 1986, it had declined about 17%, to 2458. By 1992, it had declined approximately 10% more, to 2215. Rubinfeld Decl. ¶ 60(b) and Figure 2; Tr. at 250–253 (Cotterill); DX 336 at NBA 0021354–57 (volume data for 1980 through 1990).

Since the Acquisition, concentration in the RTE cereal industry has continued to decline. Although the Acquisition increased the HHI by 66 points, the HHI declined in 1993 by 58 points. Accordingly, the net increase since the Acquisition has been only 8 points (to 2223 from 2215). Rubinfeld Decl. ¶ 60(b) and Figure 2.

### B. *Measurement of Nabisco Share*

Nabisco's 1992 actual market share, 2.82%, is the appropriate measure of Nabisco's competitive significance at the time of the Acquisition. Rubinfeld Decl. ¶ 66.

#### 1. *Nabisco was in decline before its acquisition by KKR*

Between 1986 and 1989, the Nabisco Shredded Wheat line's market share fell from 4.11% to 2.89%. DX 174; Tr. at 1429 (Cotterill); see also Thomas Decl. ¶¶ 17, 36; Tr. at 1877 (Thomas); Rubinfeld Decl. ¶ 66(b). Nabisco's Shredded Wheat cereals

began losing market share before Nabisco was acquired by Kohlberg, Kravis and Roberts ("KKR") in 1989. Its loss of market share through 1992 is attributable both to a short term profit strategy (the so-called "harvest strategy"), stressed by plaintiff, and to a number of factors plaintiff downplays, including: (1) reduced consumer interest in Nabisco Shredded Wheat, and consumer movement to new, tastier, and more complex products; (2) the oatbran "craze"; (3) lack of effective advertising; (4) lack of successful product innovations and lack of a full line of products; (5) line extensions that cannibalized the core Nabisco Shredded Wheat cereals; (6) quality problems; (7) Kellogg's introduction of an unsweetened shredded cereal; and (8) a change in Nabisco's distribution. Thomas Decl. ¶¶ 21–33; Hinkes Decl. ¶ 23; Rubinfeld Decl. ¶ 66; Tr. at 1877–78 (Thomas); DX 176 at KGF 0118036–039; Leckie Decl. ¶ 65.

The core Nabisco Shredded Wheat cereals—Spoon Size and Big Biscuit—had started their decline in market share even earlier. Between 1985 and 1989, Spoon Size's market share declined about 43 percent. During the same time period, Big Biscuit's market share declined about 35 percent. Thomas Decl. ¶ 18; DX 174; DX 317 at NBA 1043333. The decline in market share for the Nabisco Shredded Wheat line in the three years preceding the so-called "harvest" period from 1989 to 1992 was almost twice as big as the decline in market share during the "harvest" period. Tr. at 1430 (Cotterill). Nabisco's temporary increase in its total market share in 1987 and 1988 was due to a very expensive launch of new products, which products were ultimately unsuccessful.

#### 2. *Shift in Consumer Preferences*

Beginning in the 1980s, several new RTE cereal products came on the market that were promoted as having health benefits, such as being high in fiber or fortified with vitamins and minerals. Although Nabisco had stressed traditionally that Nabisco Shredded Wheat was a natural product, it did not have the same health benefits of these new brands and lost market share to them. Thomas Decl. ¶ 22; Rubinfeld Decl. ¶ 66(c).

### a. *Oat bran craze*

Nabisco Shredded Wheat's market share was strongly affected by the oat bran "craze" that resulted from reports that a diet high in oat bran reduced blood levels of cholesterol. DX 330 at KGF 0068696; Rubinfeld Decl. ¶ 66(c). These reports resulted in a dramatic surge in the development and sale of oat bran RTE cereals, including Kellogg's Common Sense Oat Bran and Cracklin' Oat Bran, and line extensions of General Mills Cheerios. DX 319 at KGF 0067129; Thomas Decl. ¶ 23; Tr. at 1573 (Cotterill). Between 1988 and 1989, a significant number of Nabisco Shredded Wheat consumers switched to oat bran products, which caused 38 percent of Nabisco Shredded Wheat's volume loss. DX 319 at KGF 0067130; DX 321 at KGF 0089663; Thomas Decl. ¶ 23; Tr. at 1859 (Thomas); Tr. at 1436 (Cotterill).

When the oat bran craze ended in 1990, Tr. at 1859 (Thomas), many consumers did not return to Nabisco Shredded Wheat. Rubinfeld Decl. ¶ 66(b) n. 38; DX 176. An October 1991 report prepared for Nabisco by Information Resources, Inc. ("IRI") concluded that Nabisco cereals had contributed 9.2 percent of oat bran's total volume gain during its period of growth, but received only 1.1 percent of oat bran's loss when the craze ended. Thomas Decl. ¶ 23; DX 343 at KGF 0070040a72.

### b. *Taste enhanced cereals*

Between 1983 and 1992, the established, basic RTE cereals of all firms lost significant market share to new "complex" products, such as products that were enhanced with the addition of dried fruits, nuts, sweeteners, or spices. Leckie Decl. ¶ 64. For example, between 1983 and 1993, General Mills established products declined 31% (or 5.6 share points), and Kellogg's established products declined 18% (or 6.2 share points). DX 256 at 5; Leckie Decl. ¶ 64. Nabisco Shredded Wheat is an unsweetened, basic cereal. Thomas Decl. ¶ 22. Many consumers stopped buying Nabisco Shredded Wheat, in part, because they thought that it was not as tasty as other cereals perceived to be "healthy," and Nabisco Shredded Wheat lost share to those new cereals. Rubinfeld Decl. ¶ 66(b) n. 38; DX 299; Thomas Decl. ¶ 24; Carroll Decl. ¶ 17.

### 3. *Lack of effective advertising and distribution*

In the late 1980s and early 1990s, Nabisco failed to develop an advertising campaign for Nabisco Shredded Wheat that was appealing to consumers. Thomas Decl. ¶ 25; DX 333 at KGF 0064587; Tr. at 1860 (Thomas). When Nabisco was unable to develop an effective advertising campaign for Nabisco Shredded Wheat, Nabisco reduced its advertising expenditures. Thomas Decl. ¶ 25; Tr. at 1860, 1906 (Thomas); DX 306. Nabisco arrested the decline of Nabisco Shredded Wheat only when it developed an effective advertising campaign in April 1992. Thomas Decl. ¶ 39. At that point, Nabisco increased expenditures on advertising by $3.4 million over the 1992 budget, and, as a result, began to stabilize Nabisco Shredded Wheat's market share in the last half of 1992. DX 276; PX 50; Thomas Decl. ¶ 26; Tr. at 1878 (Thomas).

Another factor contributing to Nabisco's decline was that Nabisco changed from a direct sales force to a less effective broker sales force in 1990. Hinkes Decl. ¶ 23; Thomas Decl. ¶ 15.

### 4. *Lack of full line of products*

Because consumers seek variety in RTE cereals, successful new product introductions are important to increasing market share. Thomas Decl. ¶ 27; Leckie Decl. ¶¶ 6, 63; Rubinfeld Decl. ¶ 91; DX 256. Nabisco's ability to develop successful new products was very limited compared with larger companies, such as Kellogg and General Mills, which had a variety of manufacturing processes, research and development resources, and the marketing ability to launch successful new products. Nabisco lacked diversified product lines that would permit a wide variety of line extensions and cross-promotion opportunities. Thomas Decl. ¶ 27; Tr. at 1885 (Thomas). Nabisco essentially was limited to introducing new shredded products. Tr. at 1885 (Thomas). This limited ability to launch new products restricted Nabisco's ability to expand its market share. Thomas Decl. ¶ 28.

Although Nabisco launched several new products in the mid 1980s, Thomas Decl. ¶ 29, each of these new products met with only limited success.[6] DX 304. Consumers tried them initially, but the new products' market shares rapidly fell below 0.5 percent. DX 174; Thomas Decl. ¶ 29. These products also contributed to the decline in market share of Nabisco's core products—Spoon Size Shredded Wheat and Big Biscuit—by cannibalizing them. Thomas Decl. ¶ 29.

Other Nabisco new product introductions were also unsuccessful. In 1989, Nabisco introduced two new oat bran products, Shredded Wheat with Oat Bran and 100% Bran With Oat Bran, but did so too late to benefit from the oat bran "craze." Those products never achieved a significant market share, and were phased out from 1990 to 1991. Thomas Decl. ¶ 30. To the extent that they attracted buyers, they did so at the expense of the core Nabisco Shredded Wheat products. For example, some Nabisco Shredded Wheat users stopped buying Spoon Size Shredded Wheat and tried Shredded Wheat With Oat Bran. DX 299 at NBA 1020451. However, when consumers abandoned Shredded Wheat With Oat Bran, they tended not to revert to Spoon Size Shredded Wheat. Thomas Decl. ¶ 31.

Nabisco introduced Teddy Graham Breakfast Bears in 1989, hoping to capitalize on the success of Nabisco's Teddy Graham cookies. However, Breakfast Bears failed because they disintegrated into mush when milk was added. Thomas Decl. ¶ 32; Rubinfeld Decl. ¶ 68(d). Nabisco spent over $20 million advertising and promoting Breakfast Bears, and it lost more than $11 million (plus its research and development costs) on the product. Thomas Decl. ¶ 32; DX 304 at KGF 1161925; Rubinfeld Decl. ¶ 68(d). Nabisco's failure caused it to be chary of introducing new products; Nabisco did not introduce any new RTE cereal on a national basis after 1989. Thomas Decl. ¶ 33.

### 5. *Harvest strategy*

Plaintiff contends that the decline in Nabisco's market share from 1989 to 1992 was due primarily to an intentional effort by Nabisco to "harvest" its RTE cereal business for short-term profits at the expense of its market share. The evidence does not support this contention. The decline in Nabisco's core cereal business began in 1986. This decline was masked in part by slight increases in market share in 1987 and 1988 that resulted from the introduction of new products that ultimately did not perform well after their introductory period. Leckie Decl. ¶ 64; Thomas Decl. ¶ 18; Tr. at 1858 (Thomas).

#### a. *"Harvest" limited to marginal brands*

Nabisco reduced marketing support for selected cereals and raised their prices in reaction to the fact that they had no future. Thomas Decl. ¶ 55; Rubinfeld Decl. ¶ 67; DX 304. This strategy was, for the most part, limited to marginal brands that had small sales and little likelihood of long term survival, such as 100% Bran, Team Flakes, and Fruit Wheats. Thomas Decl. ¶¶ 54–56; Rubinfeld Decl. ¶ 67. Although Nabisco treated its Frosted Wheat Squares as a "cash cereal" in the early 1990s, Nabisco decided, in light of the success of Kellogg's similar Frosted Mini–Wheats, that Frosted Wheat Squares had long-term potential. DX 330. Nabisco decided that the product's taste, appearance and packaging needed work, and it had plans to reformulate and relaunch the product in 1993. DX 330 at KGF 0068717; Thomas Decl. ¶ 57.

#### b. *Nabisco continued to support Nabisco Shredded Wheat*

Nabisco did not adopt a harvest strategy with respect to Nabisco Shredded Wheat. It attempted, instead, to increase Nabisco Shredded Wheat's market share. Its marketing plans for 1990, 1991, 1992, and 1993 reflected that objective. Thomas Decl. ¶ 38; Tr. at 1863 (Thomas).

#### i. *Defense against Kellogg*

In 1990, Kellogg introduced an unsweetened vitamin-fortified shredded wheat product in two test markets, Buffalo and Seattle/Portland. Tr. at 1451 (Cotterill). Nabisco responded to Kellogg's initiative

---

**6.** Nabisco introduced Shredded Wheat 'N Bran in 1985, Fruit Wheats in 1986, and Frosted Wheat Squares in 1988. DX 174; DX 330 at KGF 0068716; Thomas Decl. ¶ 29.

by introducing Spoon Size Plus, a vitamin-fortified version of Spoon Size, in those markets. Thomas Decl. ¶ 41; Tr. at 1880–81 (Thomas).

To compete against Kellogg, Nabisco funded substantial promotional activities in the test areas, including funding free standing inserts ("FSIs") with high value coupons, trade promotions, and more effective advertising. Tr. at 1881 (Thomas); DX 297. Because Kellogg's cereal had a lower list price than the Nabisco product, Nabisco offered retail trade allowances in the test markets in an effort to meet Kellogg's price. Tr. at 1880–81 (Thomas); DX 297 at KGF 0061508. Nabisco's promotional expenditures in the test markets were almost $4 million for 1990 and 1991. Tr. at 1880–81 (Thomas); DX 297 at KGF 0061515, 523. In 1990, Nabisco's promotional expenditures for Spoon Size Plus in the test markets were almost three times the rate of its nationwide expenditures on Nabisco Shredded Wheat. Tr. 1882 (Thomas); DX 297 at KGF 0061515. Kellogg withdrew its new product from the test markets within eighteen months. Thomas Decl. ¶ 42.

Nabisco's defense against the Kellogg's product ultimately hurt the Nabisco Shredded Wheat line. Spoon Size Plus took market share away from the other Nabisco Shredded Wheat products in the test markets, and its promotion caused a decline in consumer awareness of Spoon Size and Big Biscuit in these test markets. DX 297 at KGF 0061513–14; Thomas Decl. ¶ 43.

### ii. Trade and consumer promotion spending

Although Nabisco reduced marketing expenditures markedly between 1989 and 1990, by 1992 they increased to about $43.9 million. Thomas Decl. ¶ 47; DX 306; DX 276 at KGF 1161893. Conversely, Nabisco's trade promotion expenditures for Nabisco Shredded Wheat increased from 1988 through 1991, and then decreased in 1992. DX 276 at KGF 1161893; DX 306. Nabisco found that it obtained little benefit from those expenditures. Its relatively limited volume resulted in its having little negotiating power with retailers to obtain effective features and displays. Tr. at 1884–85 (Thomas). Retailers either chose not to promote Nabisco's prod-

ucts at all, or simply reduced the shelf price of Nabisco's products, which is a relatively ineffective type of promotion. Thomas Decl. ¶ 49.

From February through April 1992, Nabisco funded a very successful promotion for Nabisco Shredded Wheat's hundredth anniversary that, along with its new advertising campaign, helped stem Nabisco Shredded Wheat's market share decline. DX 330 at KGF 0068696; PX 50; Thomas Decl. ¶ 51.

### iii. Reformulation of Spoon Size

In an effort to maintain Nabisco Shredded Wheat's market share, Nabisco improved the quality of Spoon Size in mid–1991. Consumers had complained that the Spoon Size biscuit was too dense. Nabisco reformulated it to make it lighter, crisper, and more appealing to consumers. Thomas Decl. ¶ 45; Tr. at 1907–08 (Thomas); DX 330 at KGF 0068702. Because the density of the biscuits was reduced by 10 to 12 percent, the reformulation of Spoon Size reduced the weight of Spoon Size packages. Because Nabisco did not lower the wholesale price of the cereal at the time of the reformulation, the result was an effective price increase of 10 to 12 percent on a per-pound basis. Thomas Decl. ¶ 53.

### iv. Transfer of RTE cereal to the Biscuit Division

In its attempt to strengthen the RTE cereal business, Nabisco transferred that business from the Grocery/Specialty Division to the Biscuit Division, which had stronger marketing and sales organizations. PX 1320A, Greeniaus Dep. at 10–12.

### 6. Plaintiff's growth projection for Nabisco is unrealistic

The market share losses suffered by Nabisco's RTE cereal business since the mid–1980s cannot be regained quickly. Intensive marketing efforts and huge expenditures for advertising and promotion over a prolonged period would be required to restore the Nabisco Shredded Wheat line to its earlier market share level. Thomas Decl. ¶ 59.

### a. Dissatisfaction of lapsed users

Much of Nabisco's share loss is attributable to negative taste perceptions on the part of former users. It is more difficult to re-

gain such lapsed users than to get non-users to try the cereals for the first time. DX 350; DX 326 at KGF 0045520; Rubinfeld Decl. ¶ 65(d); Thomas Decl. ¶ 60. Almost 70 percent of the lapsed users—those who had switched from Nabisco Shredded Wheat to other brands as its share declined—said they would not buy Nabisco Shredded Wheat again. DX 350 at KGF 0833801; DX 326 at KGF 0045520; Thomas Decl. ¶ 60. Studies by Post and Nabisco suggest that it will be very difficult to persuade these lapsed users to switch back to Nabisco Shredded Wheat. Thomas Decl. ¶ 60; Rubinfeld Decl. ¶ 65(d); DX 350. Because of their lack of consumer acceptance, the declining market shares of Fruit Wheats and Team Flakes are unlikely to be regained at all. Thomas Decl. ¶ 61; Hinkes Decl. ¶ 32; *see also* Opinion and Order, Sept. 12, 1994 at 21.

To regain market share for the Nabisco cereals, any owner of the Nabisco cereals would have to convince consumers—both lapsed users and new users—to switch from the cereals they now eat to Nabisco cereals. Rubinfeld Decl. ¶ 65(c). Before the Acquisition, Post estimated that it would have to invest about $150 million in increased advertising, promotion, and other activities to raise Nabisco Shredded Wheat's share by even about 0.5 percentage points. Hinkes Decl. ¶ 27; Rubinfeld Decl. ¶ 65(c); DX 108 at KGF 0155780. Post's actual share gain for the Nabisco RTE cereal products was 0.12% in the first year of Post's ownership. Leckie Decl. ¶¶ 57–61; Rubinfeld Decl. ¶ 65(a).

Post's own experience with its Post line of cereals shows that it is very difficult to regain lost market share in the highly competitive RTE cereal industry. Rubinfeld Decl. ¶ 65(b). From 1982 to the end of 1989, Post's market share declined steeply, from about 16.6% to about 10.7%. DX 121 at KGF 0551206; Leckie Decl. ¶ 71; *see also* Hinkes Decl. ¶ 4. In the five years since 1989, after Post significantly increased advertising and promotion expenditures, reformulated and improved its products, and introduced a number of successful new products, Post increased its market share for its entire line by only about 2 share points. Leckie Decl. ¶ 71; *see* Hinkes Decl. ¶¶ 5–9. Despite the fact

that Post grew faster than any other branded RTE cereal manufacturer during those five years, Post has not achieved a growth rate anything like the nearly 100% share increase in three years hypothesized for the Nabisco cereals by plaintiff. Leckie Decl. ¶ 71; Rubinfeld Decl. ¶ 65(b). There is no precedent in the RTE cereal industry for projecting such dramatic growth for Nabisco in three to four years. Rubinfeld Decl. ¶ 65. It is also highly unrealistic to project market share growth for an independent Nabisco without taking into account the probable responses of the other manufacturers. Rubinfeld Decl. ¶ 65(c).

b. *Plaintiff's erroneous assumptions*

The evidence does not support plaintiff's argument that Nabisco's 1992 market share should be increased by 2.76% share points, or nearly 100% over its actual share of 2.82%, Cotterill Aff. ¶ 84, based on (i) Post's planning documents in 1994, (ii) a hypothesized share increase due to a projected price decrease by a hypothetical new owner of the former Nabisco RTE cereal assets, and (iii) a hypothetical new product introduction.

First, the Post 1994 Strategic Planning Assumptions, DX 117, on which plaintiff relies for the assumption that Nabisco's market share will increase by 1.39 share points by 1998, does not support that assumption. Post itself "hedged" that data to reflect Post's experience that its marketing tactics and initiatives do not work perfectly and that there will be unanticipated competitive situations. Leckie Decl. ¶ 44. Plaintiff did not take that hedge into account when it relied on Post's projection of future volume.

It is also inappropriate to use Post's unhedged projection for the 1998 market shares of the Nabisco RTE cereal products as a measure of those products' "competitive significance" at the time of the Acquisition, as urged by plaintiff and its expert, given that the 1998 projections assume a new product launch that has not taken place and a major capital investment by Post. Leckie Decl. ¶ 70; Rubinfeld Decl. ¶ 64.

Plaintiff's expert, Professor Cotterill, projected that an independent owner of the Nabisco RTE cereal assets would decrease prices on its cereal by 20%, and would, as a

result, expand its market share by more than 1 share point. There is, however, no excess capacity capable of producing the additional volume of shredded RTE cereals that plaintiff asserts could be sold as a result of this decrease in prices. Tr. at 2082–2085 (Leckie); Leckie Decl. P 70; Rubinfeld Decl. ¶ 64(c). In order to create that new capacity, any owner of the assets would be required to invest at least $80 million, in addition to the significant amount Post already plans to invest in the Nabisco business, to create enough capacity to produce the projected increase in volume. This would take at least two years. Leckie Decl. ¶ 74; DX 132.

Post has stabilized Nabisco Shredded Wheat cereals' market share by increasing marketing and advertising expenditures in 1993 by about 33% over their levels in 1992, the last year Nabisco owned the assets. Leckie Decl. ¶ 75; Hinkes Decl. ¶ 28. In 1994, Post increased advertising and promotion expenditures 39% over the 1993 levels. Leckie Decl. ¶ 75. This level of spending is required to maintain the Nabisco Shredded Wheat cereals' competitive position. Leckie Decl. ¶ 75.

Plaintiff's expectation that a new owner of the Nabisco RTE cereal assets would decrease prices by 20% is based on unrealistic assumptions. Tr. at 2385–86 (Kahn). A financially prudent new owner of the Nabisco RTE cereal assets would not (i) maintain advertising and promotional expenditures at Post's 1994 level, (ii) invest in the new capacity needed to introduce new products and to produce additional quantities of existing products, and (iii) suffer the losses incurred in the first years of a new product introduction (which plaintiff estimates to be between $40 and $100 million per product, Cotterill Decl. ¶¶ 168–69), while also decreasing wholesale prices—and thus revenues—by 20%. Leckie Decl. ¶ 75; Rubinfeld Decl. ¶ 64(c); Tr. at 2088–90 (Leckie); Tr. at 2376–79, 2385–86 (Kahn).

Post's econometric analysis calculated that even a ten percent decrease in price for any of the products in the Nabisco Shredded Wheat line would be unprofitable. DX 185 at KGF 0267908; Rubinfeld Decl. ¶ 64(c). It is unlikely that either Post or any hypothetical new owner of the Nabisco assets could rapidly increase Nabisco Shredded Wheat's market share simply by reducing price. Leckie Decl. ¶ 74.

Even if a new owner of the Nabisco RTE assets *were* to lower wholesale prices by 20%, it is unreasonable to assume that those price decreases would be passed on in their entirety to consumers by retailers. DX 209; Leckie Decl. ¶ 75; Schene Decl. ¶ 6; Tr. at 1731–1732 (Schena). Plaintiff also assumes, completely unrealistically, that Kellogg, General Mills, and Post would not respond to such a dramatic price cut. Rubinfeld Decl. ¶ 64(c).

Further evidence that plaintiff's theory is unrealistic is seen in the fact that, prior to the Acquisition, when Nabisco was an "independent" cereal manufacturer, it did not follow the strategy suggested by plaintiff's expert. Nothing in the record suggests that Nabisco perceived plaintiff's hypothetical strategy as profitable. Rubinfeld Decl. ¶ 64(c); Tr. at 2376–79 (Kahn). It is unreasonable to assume that smaller firms in the industry would follow the risky strategy proposed by plaintiff. DX 132; Tr. at 2238–51 (Cotterill).

The court credits Professor Kahn's view that there is no reasonable probability that a new owner of the Nabisco RTE cereal assets would compete on price any differently from Nabisco or Post. Tr. at 2378 (Kahn). Professor Kahn's conclusion is credible and is supported by substantial evidence.

Plaintiff's econometric analysis of the price reduction that a new owner of the Nabisco RTE cereal assets would institute is flawed and methodologically unsound. Rubinfeld Decl. ¶ 148(h)–(j); Tr. at 2376–79 (Kahn).

### c. Market share increase due to introduction of new cereals

There is no basis in the record for plaintiff's assumption that a new owner of the Nabisco RTE cereal assets could quickly increase market share by successfully introducing new products.

Because the Nabisco RTE cereal assets have no excess capacity available to produce shredded products, any owner of those assets would have to invest at least $40 to $50

342

million (on top of the significant amount that Post plans to spend to build the capacity that it expects to need based on its projections) to build the new capacity to introduce the new products hypothesized by plaintiff's expert. Leckie Decl. ¶ 73.

Post's 1998 market share projection for the Nabisco RTE cereals contained in its 1994 Strategic Planning Assumptions already assumes a successful relaunch of Frosted Wheat Bites and a successful launch of another new product. Plaintiff's hypothesis that Nabisco would increase share by introducing new products thus either double counts the new products Post has already built into its market share assumptions, or it relies upon the successful introduction of a third new product by 1998. Leckie Decl. ¶ 73; Rubinfeld Decl. ¶ 64(d). This assumption is unrealistic because, among other things, it assumes that an independent Nabisco would be more successful than the industry average in developing new products. There is no evidence to suggest than an independent Nabisco would outstrip the industry average in developing new products. Tr. at 2364, 2374, 2389 (Kahn).

### 7. Conclusion: Nabisco's 1992 market share accurately reflects its competitive significance

Nabisco's 1992 market share does not understate its competitive significance. The "adjustment" to Nabisco's market share proposed by plaintiff is unwarranted.

### III. Likelihood that the Acquisition Will Produce Anticompetitive Coordinated Effects

#### A. Dimensions of Competition

Manufacturers of RTE cereals compete on the basis of price, quality, new product introductions, consumer promotions, trade promotions, and advertising. Smith Decl. ¶ 10; Rubinfeld Decl. ¶¶ 103–04. For collusion to be successful, it would have to control most or all of these forms of competition. Rubinfeld Decl. ¶¶ 104, 111. See Tr. at 2368 (Kahn).

The over 200 RTE cereals currently in the market are heterogeneous. See Leckie Decl. ¶ 4; Tr. at 822 (Rubinfeld); Tr. at 99 (Cotte-

rill). Collusive behavior is most likely to occur in concentrated industries with homogeneous products, and is less likely to occur in industries with heterogeneous products. See Rubinfeld Decl. ¶ 85. Where products are heterogeneous, the products compete with one another with respect to their product characteristics, as well as on the basis of price and the other forms of competition noted above. The combination of RTE cereals' heterogeneity and the multiple forms competition takes, renders anticompetitive coordinated effects difficult and unlikely. Id. ¶ 85–86.

#### 1. There is No Evidence of Close Coordination in Price

RTE cereal products are priced at widely varying wholesale prices per pound. DX 9, 15. RTE cereal manufacturers issue wholesale list prices for their products periodically. Boehm Decl. ¶ 49; Smith Decl. ¶ 54; Schene Decl. ¶ 23. Post learns of its competitors' wholesale pricing actions through public announcements by competing manufacturers, and from retail customers who inform Post's sales people of a competitor's price change. Leckie Decl. ¶ 47 n. 9; Schena Decl. ¶ 12; see also Smith Decl. ¶ 55.

Generally, Kellogg and General Mills are the first to announce changes in wholesale list prices. Schena Decl. ¶ 7; Smith Decl. ¶ 54; Thomas Decl. ¶ 82; Rubinfeld Decl. ¶¶ 70, 73, Table 2. Post and other RTE cereal manufacturers often follow wholesale price increases by Kellogg and General Mills, but they do not do so all the time, or across the board. Parker Decl. ¶ 37; Smith Decl. ¶ 55; Schena Decl. ¶¶ 8, 9, 11; Rubinfeld Decl. ¶¶ 72–78, Table 2 and Appendix 1. Nabisco and Ralston generally react to wholesale price increases at about the same time as Post. Parker Decl. ¶ 35; Schena Decl. ¶ 29; see also Rubinfeld Decl. ¶ 74(a). It is rational and profit-maximizing for a manufacturer the size of Post to "follow" generally the price movements of the larger firms. Leckie Decl. ¶ 56. That behavior is competitively neutral and does not support an inference of impermissible coordination. Before the Acquisition, Nabisco was also a price "follower"—it did not initiate wholesale price

changes, and did not play a "maverick" role. Rubinfeld Decl. ¶ 77 n. 48.

During the past twelve months, General Mills has pursued a new pricing strategy, diverging from its competitors. Leckie Decl. ¶ 52; Schena Decl. ¶ 10; Rubinfeld Decl. ¶¶ 74(b), 78. Although Kellogg and Post announced, in early 1994, price increases on more than half of their cereals, in April 1994 General Mills announced a 10–15% wholesale price rollback on about 40% of its volume sales. Leckie Decl. ¶ 52; Schena Decl. ¶ 10; Rubinfeld Decl. ¶ 78(b), (c).

The timing and conditions of wholesale price changes vary over time, and from manufacturer to manufacturer. For example, an RTE cereal manufacturer may allow retailers to order a specified amount of cereal at the old price so long as the order is received before a certain deadline or there may be a case limit on the amount of new cereal that can be purchased at the old price. Boehm Decl. ¶ 49.

### 2. *Rubinfeld Pricing Analysis*

Defendant's expert economist, Professor Rubinfeld, studied wholesale list price information for over 90 RTE cereals, using wholesale list price announcements from January 1987 through April 1994. Rubinfeld Decl. ¶ 72. That study, which the court deems reliable, found that wholesale price responses to any particular price change were not uniform, either for the firm's product line as a whole or on a brand basis. DX 8; Rubinfeld Decl. ¶ 75. Some firms took an average price increase greater than the price initiator's average price increase, others responded with a lower average price increase, and others took no increase at all. Rubinfeld Decl. ¶ 75. At the brand level there was even greater variation in pricing responses. Rubinfeld Decl. ¶ 76; DX 9. The great variation in brand level price increases suggests that there has been no tacit collusion on wholesale pricing. Rubinfeld Decl. ¶ 77, Figures 3 and 4.

Price "followship" is rendered more difficult in the RTE cereal market because wholesale price increases are often accompanied by some form of "give back" to the ultimate consumer. In this industry, the "give backs" must be planned many months in advance, rendering immediate replication of a competitor's combined price-increase-with-give-back impossible. For example, because Kellogg and General Mills know in advance when they will announce wholesale price increases, they can, and do, plan increases in trade promotion and consumer coupons to occur at the same time as the wholesale price increase is passed on to consumers by the retail trade. This tactic of simultaneously "spending back" a price increase through trade and consumer promotions enables the price initiator to maintain some of the volume of sales that it might otherwise have lost as a result of the price increase. Leckie Decl. ¶ 11; Parker Decl. ¶ 31; Rubinfeld Decl. ¶ 107. It takes at least three months—and often a full year—to implement trade and consumer promotion programs. Because Post does not initiate wholesale price increases in the RTE cereal category, and it does not know in advance when Kellogg or General Mills will do so, Post cannot react quickly to "give back," or "spend back," a price increase, because it takes so long to implement trade and consumer promotion programs. Leckie Decl. ¶ 11.

The trade deal and promotion activity in the RTE cereal industry is inimical to collusive behavior, because it is difficult for manufacturers to track and replicate other firms' promotions, and it is especially difficult to track the amounts expended on promotions. Schena Decl. ¶¶ 30, 32–35; Parker Decl. ¶ 26.

### 3. *Retailers' Buying and Pricing Behavior*

Retailers buy large amounts of RTE cereals—in some cases 80% or 90%—on "deal," that is pursuant to discounts that RTE cereal manufacturers regularly offer as incentives to retailers. Boehm Decl. ¶ 50; Smith Decl. ¶ 58; Tr. at 685–86 (Smith). Retailers attempt to maximize the amount of cereal they purchase on trade deals. Boehm Decl. ¶ 50; Smith Decl. ¶ 58.

RTE cereals have one of the highest rates of trade dealing of any grocery product category, whether measured by frequency or by dollar value. Smith Decl. ¶ 56. The trade deals offered by RTE cereal manufacturers vary significantly in their timing, terms, con-

ditions, and products covered. Boehm Decl. ¶¶ 50–51; Smith Decl. ¶ 56. Typically, individual RTE cereal trade deals provide retailers with the opportunity for a 20% to 30% discount off the wholesale list price. Boehm Decl. ¶ 50; *see also* Smith Decl. ¶ 56. At times, trade deals are so large that retailers can sell the cereal at half the non-promoted retail price. Tr. at 658 (Smith).

Each retail division or purchasing unit of a national retail chain independently assesses the RTE cereal trade deals available to it and independently decides how much to buy. That decision is affected by the retailer's existing inventory, the terms of the trade deal, the competitive conditions within the retailer's region, and the retailer's particular needs and strategies for the products covered at the time in question. Boehm Decl. ¶ 53; Smith Decl. ¶ 60. Retail divisions and retailers as a whole display a wide range of responses to a particular trade deal. Boehm Decl. ¶ 53.

Overall, RTE cereal manufacturers significantly increased their spending on trade deals over the past several years, resulting in bigger and more frequent discounts to retailers. Boehm Decl. ¶ 52; Smith Decl. ¶ 57; Rubinfeld Decl. ¶ 96. Recently, RTE cereal manufacturers have shifted more of their trade promotion spending from base trade deals to trade performance offers, in an attempt to ensure that a larger percentage of that spending is reflected in lower retail prices. Tr. at 1664–65 (Hinkes).

Post's total trade promotion spending almost doubled between 1989 and 1993. In 1994, Post expects to increase its trade promotion spending by over 50% above 1993. Leckie Decl. ¶ 10; *see also* Tr. at 1734 (Schena). In mid–1993, Kellogg and General Mills increased their trade promotion spending significantly, including the use of large numbers of buy-one-get-one-free ("BOGO") retailer coupons. Leckie Decl. ¶ 16. Given the number and frequency of trade deals in the RTE cereal category, retailers do not accept all of them, and must choose among them for the right mix of benefits. Boehm Decl. ¶ 52; Smith Decl. ¶ 60. As Mr. Boehm of Kroger explained: "Each Kroger division independently assesses the trade deals on RTE cere-

al products available to it, and independently decides the extent to which the division will make purchases pursuant to the deal.... Each Kroger division also independently decides how and when to pass along trade deal savings to its customers. These decisions are made with only limited input from the manufacturers, and are based largely on the competitive environment in the particular division." Boehm Decl. ¶¶ 53–54; *see also* Smith Decl. ¶¶ 59–63. The wide variation in retail prices for a particular RTE cereal at any given time reflects this substantial variation in retailer markups and responses to trade deals. Rubinfeld Decl. ¶ 97.

Although *wholesale* list prices for RTE cereal products are set by manufacturers, *retail* prices are set completely independently by retailers based on the retailers' own competitive circumstances, including their retail competition, overhead, financial incentives and pricing strategies. Leckie Decl. ¶ 50; Schena Decl. ¶ 6; Smith Decl. ¶¶ 49–50; Boehm Decl. ¶¶ 47, 59–61; Rubinfeld Decl. ¶ 13(a).

National retail grocery chains frequently decentralize their retail pricing decisions, and the regional divisions then often set different retail prices for RTE cereal by locality. Boehm Decl. ¶ 47, 59; Smith Decl. ¶¶ 49–50; Tr. at 688 (Smith). Thus, despite a uniform national wholesale price, there are dramatic differences in the retail prices charged for the same cereal from region to region, and from store to store within a given region. Boehm Decl. ¶¶ 59, 61; Smith Decl. ¶¶ 49–50; Leckie Decl. ¶ 51; Thomas Decl. ¶ 86; DX 315 at KGF 0060826, *et seq.*; DX 220 (the average unpromoted retail price of an 18–ounce box of Post Toasties as of October 1993 ranged from a low of $1.60 at Farm Fresh in Richmond to a high of $3.23 at Food 4 Less/Boys/Viva in Los Angeles; in Houston, the price of that same box of Post Toasties ranged from $1.93 at Fiesta Mart, to $2.13 at Kroger, to $2.29 at Appletree, to $2.47 at Gerland's, to $2.59 at Randall's).

Similarly, each retail division or purchasing unit decides independently how and when to pass along trade deal savings to its customers. Boehm Decl. ¶ 54; Smith Decl. ¶ 62. For example, a division may decide to reflect

trade deal savings on the shelf price immediately, or the division may decide to change prices only on inventory. Smith Decl. ¶ 62. These decisions are made with relatively little input from manufacturers, and are based largely on the competitive conditions in the particular geographic region. An exception is when a particular retail "performance" is required as a condition of the deal. Boehm Decl. ¶ 54. The impact of trade deals on the retail pricing of RTE cereals varies widely among retailers and even among the same retailer's separate geographic divisions. Smith Decl. ¶ 63.

Even when there is no existing trade deal open for a particular RTE cereal, retailers generally have the ability to keep their costs below the wholesale list prices published by the RTE cereal manufacturers. Boehm Decl. ¶ 55. Retailers engage in extensive "forward buying" of RTE cereals when the cost for the product is attractive, and stock up on RTE cereals for future need. Forward buying is an option typically available to all retailers. RTE cereal manufacturers have no way to know the extent to which their retail customers are forward buying. Boehm Decl. ¶ 55; see also Smith Decl. ¶¶ 61, 64. Retailers can also often purchase RTE cereals below list cost from "diverters." Diverters are entrepreneurs who make money by geographic or time value arbitrage. For example, diverters buy from retailers who find themselves with excess inventory bought pursuant to a forward buy. Boehm Decl. ¶ 56; see also Tr. at 661–62 (Smith).

Because of the availability of trade deals, forward buying, and diversion, the retailer's costs for RTE cereals on the shelf at any given time vary substantially by retailer and by region. Any accurate consideration of retail purchase costs in setting retail prices would have to take trade deal discounts, forward buying, and "diverting" into account. Boehm Decl. ¶¶ 50–58; Smith Decl. ¶¶ 56–64; Tr. at 650–58 (Smith). Retailers cannot track their competitors' costs for RTE cereal, nor can manufacturers. Boehm Decl. ¶ 58.

Although retailers consider their product costs in setting retail prices for RTE cereal, a major factor in setting retail RTE cereal prices is the local retail competitive conditions. Boehm Decl. ¶ 59; Smith Decl. ¶¶ 50–51; Tr. at 679–80 (Smith). Retailers regularly check their competitors' prices store by store. Boehm Decl. ¶ 59; Smith Decl. ¶ 50. In response to local competitive conditions, retail prices of RTE cereals frequently change in the absence of changes in wholesale list prices by the RTE cereal manufacturers. Boehm Decl. ¶ 59.

### 4. Consumer promotions

Consumer promotions deliver incentives to consumers to try new cereals or repeat purchasing of other cereals; they include all types of manufacturer couponing, in-store sampling, sweepstakes, premiums, special packs, and "continuity" programs (such as frequent purchaser clubs). Fasano Decl. ¶ 3. Their dollar value is substantial. Fasano Decl. ¶ 3.

Couponing can directly reduce the price consumers pay for RTE cereals, unlike other trade promotions, as to which retailers can decide how much, if any, savings to pass along to the ultimate consumer. Thomas Decl. ¶ 86. Coupons are one of the most effective incentives RTE cereal manufacturers have to induce consumer purchase. Consumers respond well to RTE cereal coupons. Boehm Decl. ¶ 63; Smith Decl. ¶ 66. The frequency and value of coupons issued for RTE cereals is very high compared with those issued for most other grocery retail items. Boehm Decl. ¶ 62.

Couponing activity by RTE cereal manufacturers, including Post, has increased substantially over the past few years. In 1993, Post spent more than 5 times as much on coupon redemption as it did in 1989. Those redemptions give direct discounts to consumers on the purchase of Post cereals. Fasano Decl. ¶ 6; Smith Decl. ¶ 65; DX 223; DX 224 at KGF 0561003.

While wholesale list prices for RTE cereal generally have increased, so have (i) the annual number of occasions when coupons are distributed; (ii) average coupon values, (iii) net coupon discounts from average non-deal price per pound, and (iv) the number of boxes of cereal sold with a coupon. Fasano Decl. ¶ 6; DX 223; DX 224 at KGF 0561003; DX 374. Between 1989 and 1993 the per-

centage of Post's cereal sold with a coupon more than doubled, and the average value of the coupons redeemed increased by 96%. DX 223; DX 224 at KGF 0561003; Fasano Decl. ¶ 6.

Coupons significantly reduce the prices consumers pay for cereal. In 1993, the average retail price per pound for RTE cereals (without adjustment for coupons) was $2.96; the average coupon value thus represented a price discount for consumers of slightly over 30%. Rubinfeld Decl. ¶ 100(c). Coupons are widely available for RTE cereal purchases at all times. DX 228 at KGF 0116676, 687; Rubinfeld Decl. ¶ 100(c) n. 67; Tr. at 1687 (Fasano).

When coupons are taken into account, the average RTE cereal price per pound paid by consumers increased by just 16 cents from 1989 to 1993, from $2.32/lb. to $2.48/lb., an increase of 6.9%. If coupons are *not* taken into account, however, the average retail price appears to increase by 12.5%, from $2.63/lb. in 1989 to $2.96/lb. in 1993. Rubinfeld Decl. ¶ 102(a) and Figure 6. In the same time period, average coupon-adjusted RTE cereal prices paid by consumers fell relative to the Consumer Price Index. Over the 1989–1993 period, RTE cereal prices net of coupons increased by 6.6%, while the Food-at-Home Consumer Price Index rose 12.8%, and the All Items Consumer Price Index rose 16.5%. Rubinfeld Decl. ¶ 102(b).

Plaintiff's expert used average RTE cereal retail price data for various purposes without taking into account the effect of manufacturer coupons on the average retail prices of cereal. *See* Cotterill Aff. ¶¶ 62, 64, 73–82. When coupons are taken into account, the retail pricing patterns suggested by Professor Cotterill changed substantially.

### 5. *Advertising*

Advertising is vital to induce consumers to try new RTE cereals, and to continue buying established products. Leckie Decl. ¶ 8.

The undisputed intensity of RTE cereal advertising makes collusion difficult and unlikely. First, it would be difficult to effect a "tacit" agreement among manufacturers to allocate particular levels of advertising expenditures among over 200 RTE cereals.

Second, firms continually attempt to improve the effectiveness of their advertising. Leckie Decl. ¶ 37; Thomas Decl. ¶ 26. It would be difficult, if not impossible, to reach tacit agreement not to improve advertising or to punish "cheating" that takes the form of more effective advertising.

### 6. *New product introductions*

Because of consumers' demand for variety, new products are key to the growth of any RTE cereal firm. DX 256 at 3; Leckie Decl. ¶¶ 6, 63; Smith Decl. ¶ 45; Rubinfeld Decl. ¶ 91. Over the past ten years, the main growth in the RTE cereal market has been in new products. Market shares of established products like Grape–Nuts and Nabisco Shredded Wheat have remained flat or have declined. Leckie Decl. ¶ 6; Carroll Decl. ¶ 17; DX 256 at 5.

Because of the importance of new products, Post maintains an active new product development program, which tests about 100 new product concepts each year. Leckie Decl. ¶ 6. From 1989 to 1993, Post introduced six new products—Honey Bunches of Oats, Marshmallow Alpha–Bits, Dino Pebbles, Great Grains, Banana Nut Crunch and Bran'nola. Post's market share growth over the last five years is attributable to these new products. Leckie Decl. ¶ 6; Thomas Decl. ¶ 24; Rubinfeld Decl. ¶ 91. Post's market share increased from 10.7% in 1989 to 12.1% in 1993. Without these new products, Post's share would have declined by about 1.5 share points, rather than increasing by 1.4 share points. Leckie Decl. ¶ 6; DX 253.

Other RTE cereal manufacturers also compete on the basis of new product introductions. Since 1989, 59 new RTE cereals have been introduced by the largest RTE manufacturers. Those cereals accounted for 12.42% of all RTE cereal sales in 1993. DX 254; Leckie Decl. ¶ 6. In 1993, 37% of General Mills' market share was attributable to products introduced since 1983, and 19% of Kellogg's market share was attributable to new products. DX 256 at 5; Leckie Decl. ¶ 6.

The continual introduction of new RTE cereal products is pro-competitive and makes

coordination more difficult. Rubinfeld Decl. ¶ 90.

### 7. *Quality improvements*

RTE cereal firms compete on the basis of product quality, and seek to improve their products and their packaging. Leckie Decl. ¶ 13. In 1994, Post improved the product quality of the Nabisco Frosted Wheat Squares and relaunched it as Frosted Wheat Bites. Post is working on major product improvements and a relaunch of Fruit 'N Fiber and Great Grains. Numerous smaller product improvements are made in Post products each year. Leckie Decl. ¶ 13. It would be almost impossible for a collusive arrangement to police firms' product improvements.

### 8. *Recent changes in firms' marketing strategies*

In April 1994, General Mills announced radical changes in its marketing practices. It announced a wholesale price decrease averaging 12% on products constituting about 40% of its line. Leckie Decl. ¶ 16; Schena Decl. ¶ 10; Rubinfeld Decl. ¶¶ 76(b), 78; *see also* Smith Decl. ¶ 11. It also, among other things, eliminated BOGOs, switched from individual product coupons to a mix of individual product coupons and General Mills line coupons, and changed its base rate trade deals from 8 cents per box for five weeks a quarter to 2 cents per box all the time. *See* DX 230. General Mills also substantially increased its advertising spending, especially on those products where it reduced price. DX 242; Leckie Decl. ¶ 54. General Mills also has reduced the circulation and frequency of its FSI coupons. Through August 21, 1994 General Mills' FSI coupons were down 24% from the same period in 1993, whereas Kellogg's FSI coupons increased 2%, and Post's increased 29%. DX 226; Leckie Decl. ¶ 54.

It appears that less than two-thirds of the General Mills price rollback has been passed on to consumers. According to Nielsen data, only about 62% of the General Mills price decrease has been passed on to consumers; retailers have retained the balance. Based upon Post's own information and the data it receives from Nielsen, it took about 10 weeks for 80 to 85% of the retail outlets to pass through to consumers some portion of the General Mills price decline. DX 209; Leckie Decl. ¶ 53; DX 384; Tr. at 1732, 1742 (Schena).

Recently, Kellogg too has dramatically changed its marketing practices; it eliminated BOGOs and proposed trade promotion programs consisting primarily of off-invoice discounts, rather than the performance-based programs it had used in the past. Leckie Decl. ¶ 16; *see also* Tr. at 1057 (Boehm).

### 9. *Competition from private label cereals*

In recent years, private label cereals have become an important competitive force. Leckie Decl. ¶ 15; Boehm Decl. ¶ 15; Smith Decl. ¶ 24; Tr. at 686 (Smith). Private label sales have grown from a 4.8% share (on a volume basis) in 1988 to a 9% share in 1993. Rubinfeld Decl. ¶ 79; DX 246. Private label and generic products have a share of 9.3% for the first eight months of 1994. Leckie Decl. ¶ 15; DX 246. This annual sales growth has surpassed that of the industry as a whole. Boehm Decl. ¶ 16; Smith Decl. ¶ 25. Mr. Smith of Safeway testified that he expects private label's share of the RTE cereal market to double within three to five years. Tr. at 713 (Smith). Some retailers now carry more than 20 different private label cereals. Smith Decl. ¶ 16; Boehm Decl. ¶ 21.

Private label RTE cereal manufacturers position their cereals to compete directly against branded RTE cereal products. Boehm Decl. ¶¶ 9, 22; Smith Decl. ¶¶ 20–22. The competitive significance of private label cereals is probably best gauged as a percent of the product form they target, rather than as a percent of the cereal market as a whole. Boehm Decl. ¶ 17; *see also* Smith Decl. ¶ 25. Private label products generally have a substantially higher percentage of the sales of the type of products they target than private label cereal products have in the market as a whole. For example, the Kroger private label product that looks and tastes most like Kellogg's Froot Loops accounts for over 39% of Kroger's total sales of this product form. Boehm Decl. ¶ 17. Safeway's nugget cereal product, which competes most directly against Grape–Nuts, accounts for 13% of

Safeway's nugget cereal sales. Smith Decl. ¶ 22.

Retailers can offer private label RTE cereals at a lower price than their branded RTE cereal counterparts in large part because private label cereal manufacturers rely on the advertising and promotion expenditures by the branded RTE cereal manufacturers to attract consumers. *See* Tr. at 709–12 (Smith). If the branded RTE cereal manufacturers did not advertise and promote their cereals, retailers and private label cereal manufacturers would find it necessary to increase their expenditures on these activities. Tr. at 712 (Smith).

When a manufacturer of a branded cereal increases consumer demand for a particular product type—through, for example, advertising and consumer promotion—it becomes more likely that retailers will consider the introduction of a private label RTE cereal product in the same form. Smith Decl. ¶ 21.

Private label producers (including Ralston Purina, Malt–O–Meal, Gilster–Mary Lee, Grist Mill, Sovex, and Jasper) have branched out from simple RTE products with which they began (such as Corn Flakes) into production of more complex products (such as cocoa, marshmallow and apple-cinnamon flavored products). DX 250A, Welge Dep. at 53–54; DX 251A, Lettmann Dep. at 25; Leckie Decl. ¶¶ 14–15; DX 128 at KGF 0351975.

Over time, private label manufacturers and retailers have become more aggressive in marketing RTE cereal to the consumer. Retailers promote their private label RTE cereal products aggressively by positioning them next to their branded counterparts and by using signs inviting consumers to compare private label brands with the national brands. Boehm Decl. ¶ 18; Smith Decl. ¶ 26.

Some retailers view private label as the most important force in the RTE cereal market today. Boehm Decl. ¶ 15. Malt–O–Meal, a branded and private label manufacturer, is the fastest growing manufacturer in RTE cereals, and competes aggressively on quality and price. Boehm Decl. ¶ 20. Malt–O–Meal has doubled its sales every five years since 1983 and is presently adding

substantial capacity. DX 251A, Lettmann Dep. at 17–18, 25; Leckie Decl. ¶ 14. From 1993 to September 1994, Malt–O–Meal's branded RTE cereals grew from having a market share of 1.95% to having a market share of 2.3%. DX 246; Leckie Decl. ¶ 14. Malt–O–Meal competes aggressively, using a price/value strategy, selling its cereals in poly bags, and generally, although not completely, avoiding advertising and consumer promotions such as coupons. Leckie Decl. ¶ 14; Boehm Decl. ¶ 20.

The growth in private label RTE cereal sales has resulted from improvements in product quality and a related growth in consumer product acceptance. Boehm Decl. ¶ 19; Smith Decl. ¶ 28. Retailers obtain a higher margin on their own private label RTE products than on branded products, and thus have strong financial incentives to become competitors—as well as the customers—of those who manufacture branded products, such as Post, and they have done so increasingly. Leckie Decl. ¶ 15; Boehm Decl. ¶ 23; Smith Decl. ¶¶ 24, 27.

Some manufacturers of private label cereals have produced more RTE cereal annually since 1991 than Nabisco did in the year before the Acquisition. Tr. at 817 (Rubinfeld); DX 250; DX 250A, Welge Dep. at 10–11; 15, 18; DX 251; DX 251A, Lettmann Dep. at 14–15; Rubinfeld Decl. Appendix 5, Figure 5.

Two private label cereal manufacturer executives testified that the RTE cereal industry is highly competitive. Lettman Dep. at 29; Welge Dep. at 44. One, Mr. Lettman, the President and Chief Executive officer of Malt–O–Meal, testified (at his deposition in July 1994) that since January 1993, he had seen no effect on Malt–O–Meal flowing from the Acquisition, and that he "would not expect to see much effect on our particular business." Lettman Dep. at 26–27. The other, Mr. Welge, President and Chief Executive Officer of Gilster–Mary Lee, testified that the Acquisition's effect on Gilster–Mary Lee's production and sales has been "absolutely none that I can tell." Welge Dep. at 42.

## 10. *Shelving*

Each retailer determines the shelf placement and shelf space for each of its RTE cereals based on the retailer's own requirements and marketing strategy. Boehm Decl. ¶ 34; Smith Decl. ¶¶ 39–43. Retail chains often decentralize shelving decisions to the division level. Boehm Decl. ¶ 34; Smith Decl. ¶ 42.

Often, smaller RTE manufacturers will obtain a greater percentage of shelf space than their market share, as a matter of inventory logistics. Boehm Decl. ¶ 45; Smith Decl. ¶ 46; DX 261. Many retailers make a effort to buy products from smaller RTE cereal manufacturers because they believe their customers prefer to be offered a variety of RTE cereals, including products from the smaller manufacturers. Boehm Decl. ¶ 45.

Post's acquisition of the Nabisco RTE cereals will not affect retailers' shelving decisions, and will not make it harder for smaller manufacturers to gain shelf space in retail stores. Boehm Decl. ¶ 46; Smith Decl. ¶ 48.

### B. *Likelihood of Tacit Collusion with respect to Promotion Activities*

There is no evidence that RTE cereal firms coordinate their behavior with respect to consumer coupons or other promotional activities.

RTE cereal manufacturers face serious impediments in attempting to monitor the behavior of their competitors. Both their ability to learn what other manufacturers are doing with respect to, *e.g.,* coupon values or trade promotions, and their ability to respond, are impeded by considerable time lags. Schena Decl. ¶¶ 32–35; Leckie Decl. ¶ 22; Tr. at 615–16, 2063 (Leckie). RTE cereal manufacturers are not aware of one anothers' merchandising plans until after they are announced or until information is obtained from a retailer. Thomas Decl. ¶ 100; Schena Decl. ¶ 35. The time lag involved in any monitoring of competitive activity makes it impossible to use monitoring as a vehicle for collusion even if the parties so desired.

Post typically begins planning its future trade deals six to nine months before the trade deals are scheduled to go into effect. Schena Decl. ¶ 33; Tr. at 1736–37 (Schena). Its trade deal plans are announced to its field sales organization nearly six months before the trade deals go into effect. Tr. at 1736 (Schena). These trade deals are communicated to retailers at least three months before a promotion begins. Tr. at 1736 (Schena). Thus, if Post decides that it has to increase trade promotion spending to be competitive, it takes at least three months for Post to present new trade deals to its retail customers. Parker Decl. ¶ 26; Schena Decl. ¶ 33. Other RTE cereal manufacturers face similar time lags. *See* Thomas Decl. ¶ 100.

Post's brand marketing groups attempt to analyze its competitors' "base rate" (simple case discount) and performance-based trade deals when Post becomes aware of them. Trade promotions are difficult to monitor, because they result from private transactions between the retailer and others; Post's knowledge of its competitors' trade deals is neither complete nor accurate. Parker Decl. ¶ 26; Schena Decl. ¶ 32. Thus, although Post tries to track the frequency of its competitors' performance-based trade deals, such as end aisle displays, store flyers, newspaper advertisements, and trade coupon or retailer coupon values, Post does not know how much its competitors are spending to achieve those trade promotions. Parker Decl. ¶ 26; Schena Decl. ¶¶ 34–35.

There is no service that provides data on the value of retailer coupons funded by RTE cereal manufacturers. Schena Decl. ¶ 34; Tr. at 1734 (Schena). Post monitors its competitors' retailer coupons only by obtaining a sample of newspaper ads and reviewing them three to five weeks after the ads run, to ascertain broad trends. Tr. at 1734–35 (Schena).

Post plans the number and timing of its own FSI coupon promotions based on affirmative strategies for its own products and is, therefore, primarily concerned with the consumer promotions it believes will support its marketing programs; and is not primarily concerned with responding tactically to another manufacturer's consumer promotions. Fasano Decl. ¶ 9. Post's planning for FSIs, its principal consumer promotion activity, be-

gins with no information concerning what its competitors may be planning. Fasano Decl. ¶¶ 11, 14. By the time Post learns of a competitor's coupon promotion, it is too late to react to it. Fasano Decl. ¶ 11. When Post decides that it needs to increase the value of FSI or other coupons to be competitive, it takes about three months for it to distribute higher valued coupons. Parker Decl. ¶ 25.

FSIs are produced primarily by two companies, Valassis Communications and News America. These companies plan in advance which Sundays during a year they will produce FSIs (they often exclude three-day weekends) and then sell space to interested advertisers. Fasano Decl. ¶ 12. Typically, FSIs are "dropped" 48 Sundays per year. Post is currently guaranteed a minimum of 28 of the 48 open dates. Because of the high demand for available "drop" dates, Post is not guaranteed to obtain its first choice in dates. Fasano Decl. ¶ 15.

Post has initially selected its preferred FSI dates for each RTE cereal based on (1) the timing of trade deals and/or Kraft corporate or other "themed" events, e.g., Kraft's "Great American Breakfast," "Holiday Homecoming," "Back to School," "Super Bowl," or the Children's Miracle Network promotion, (2) coupon redemption patterns, and (3) a preference to provide only 4 or 5 Post coupons on any given Sunday, thus encouraging a "rotation" of Post products. Leckie Decl. ¶ 11 n. 3.

When Post reserves dates for FSIs, Post does not know the dates other RTE cereal manufacturers may be selecting for their FSIs. Fasano Decl. ¶ 17. Because of the long lead time required for the production aspects of an FSI, it is almost impossible for Post (or any RTE cereal manufacturer) to respond to, or to coordinate with, any other company's FSI couponing. Fasano Decl. ¶ 25.

Post monitors its competitors' couponing to a limited extent, but only in retrospect, and only to see the trends in the number, timing, and value of other manufacturers' events. Because Post receives no prior notice of when other cereal manufacturers are planning to "drop" their coupons, Post could not tacitly coordinate its activities in any way with its competitors. Fasano Decl. ¶ 9. Post monitors its competitors' couponing activities in order to remain competitive in the industry, not to "coordinate" its activities with those of its competitors. Fasano Decl. ¶ 8–9.

Typically, the time required to execute a dissemination of manufacturer's coupons other than through FSIs is at least as long as that required for FSIs, if not longer, because direct mail companies are even less flexible about production timing than are the FSI companies. Fasano Decl. ¶ 24.

Post brand marketing groups analyze the couponing activity information Post receives regarding competitive promotions in order to keep abreast of competitive forces in the marketplace. Post brand groups keep track of competitors' RTE cereal couponing in the form of FSIs, including which brands are advertised on what date; the redemption value of the coupons; the number of national events; and the number of regional events. Parker Decl. ¶ 25. Post is unable to obtain reliable information on its competitors' product samplings, in-store events, on-pack coupons and in-pack coupons, sponsorships, and premiums. Roughly 34% of total consumer promotion spending by other manufacturers cannot be tracked by Post. Fasano Decl. ¶ 10; DX 235 at KGF 0569014.

Post also tracks average retail prices for each of its cereals. This average retail price information gives a general indication of how retailers are pricing Post's products. Through this monitoring, Post can assess how effective its trade spending is in lowering the retail price of its products, and can learn when new marketing tactics are necessary to remain competitive. Parker Decl. ¶ 27.

C. *There is No Evidence that RTE Cereal Manufacturers Can, or Do, Punish Competitors*

There is no evidence that RTE cereal manufacturers could punish, or have punished, any deviations from the "terms of coordination" that plaintiff alleges exist in the industry. For reasons stated above, it would be very difficult to punish "cheaters" with a

targeted response; a targeted response usually would require a long lead time; and it would be difficult to "aim" a response selectively enough to limit the impact of the response solely to the "cheater." Price cutting and couponing, for example, generally would affect "cheaters" and "noncheaters" alike. Rubinfeld Decl. ¶¶ 89(c) n. 61, 99(d) 110.

### D. *Industry Profitability*

There is no evidence that profit levels in the RTE cereal industry reflect impermissible market power or collusive behavior.

### E. *Retailers Who Testified Support the Acquisition*

Plaintiff offered no evidence that retailers object to, or have been harmed by, the Acquisition. By contrast, Post presented testimony by representatives of two of Post's largest customers, Safeway and The Kroger Co., in support of the Acquisition. Neither retailer has seen any decrease in competitive activity in the RTE cereal industry since Post acquired the former Nabisco RTE cereal assets. Boehm Decl. ¶ 65; Smith Decl. ¶ 69. They testified that trade dealing, couponing, and price competition between RTE cereal manufacturers have increased since 1992. Boehm Decl. ¶ 66; Smith Decl. ¶ 69. These retailers testified that they believe that Post's acquisition of Nabisco cereals will not harm them in any way. Boehm Decl. ¶ 65; Smith Decl. ¶ 70. They do not expect the acquisition to facilitate collusion in the RTE cereal industry or to give Post any power to increase the price of RTE cereals. Boehm Decl. ¶ 67; Smith Decl. ¶ 70.

In fact, both of the retailers who testified in this case indicated that the Acquisition is likely to strengthen, not weaken, competition in RTE cereals because it makes Post a stronger competitor to Kellogg and General Mills, more able to challenge them effectively. Boehm Decl. ¶ 67; Smith Decl. ¶ 71.

### F. *Conclusion of Court–Appointed Expert*

The Court's independent economic expert, Professor Kahn, concluded, based on the evidence presented at trial, that he saw

"no serious claim ... that a separate Nabisco will be a more powerful or more effective product varier, advertiser, innovator than Post itself or the Post–Nabisco combination. . . .

If anything, the evidence seems to be that the acquisition contributed to the rejuvenation of Nabisco as a competitor in these ways after a period of almost deliberate withdrawal from the cereals business." Tr. at 2374 (Kahn).

In considering "whether a Nabisco, independent of Post, would have competed or would hence forward be likely to compete in ways more closely resembling the pure or perfect competition model," Tr. at 2375 (Kahn), Professor Kahn concluded that there is an "absence of any evidence in the record ... that Nabisco, when it was independent, was in fact more prone to compete directly on price than the larger manufacturers, that it was indeed a maverick in its fidelity in following price changes instituted by the acknowledged leaders, Kellogg and General Mills." Tr. at 2376–77 (Kahn). Professor Kahn also stated that "the fact of the undeniable possibility that a newly-independent Nabisco might, by altering the way in which it competes, measurably move this industry in the direction of more direct consumer welfare, enhancing price competition, must confront the opposing fact that this is not how firms operate in this industry." Tr. at 2378 (Kahn). Although Professor Kahn expressed reservations concerning the types of competition practiced in the RTE cereal industry (including "its very heavy emphasis on advertising, product differentiation, product proliferation and variation." Tr. at 2366 (Kahn)), and expressed his "wish [that] there were ways of stretching the antitrust laws to discourage the ways in which this industry competes," he saw no "reasonable likelihood that dissolving this merger" would change the nature of competition in the industry. Tr. at 2379. Professor Kahn concluded that he did not see "any evidence in the record that a separated Nabisco would compete more intensely or effectively in these ways [that the industry competes] than Post–Nabisco has in fact done in the last few years." Tr. 2379 (Kahn). He also found that "[t]he industry is clearly keenly competitive in important di-

mensions...." Tr. at 2365–66 (Kahn). Professor Kahn's conclusion that there is no reasonable probability that the Acquisition will have anticompetitive coordinated effects is credible and is supported by substantial evidence.

### IV. Likelihood that the Acquisition Will Produce Anticompetitive Unilateral Effects

#### A. Grape–Nuts and Nabisco Shredded Wheat Are Not Each Other's Closest Competitors

The evidence does not support plaintiff's claim that the Acquisition will have adverse unilateral competitive effects.

The evidence, including consumer consumption and purchase information, and econometric evidence, shows that Grape–Nuts and Nabisco Shredded Wheat compete with many other products and are not the first and second choices of a significant number of consumers. See generally Federal Horizontal Merger Guidelines § 2.21.

##### 1. Grape–Nuts and Nabisco Shredded Wheat Are Physically Dissimilar

Grape–Nuts and Nabisco Shredded Wheat are physically quite different, are produced by different processes and from different grains, and each has its own unique taste, texture, and product form. Parker Decl. ¶ 18; Carroll Decl. ¶ 55(d); Rubinfeld Decl. ¶ 113 n. 76. Grape–Nuts and Nabisco Shredded Wheat are physically "close" only in the sense that each is a textured cereal with an unusual shape and texture. Parker Decl. ¶ 18. Grape–Nuts are dense, hard nuggets baked from malted barley, mixed with wheat; Nabisco Shredded Wheat is a light, woven wheat biscuit. Grape–Nuts has added salt; Nabisco Shredded Wheat has no salt. Carroll Decl. ¶ 55(d). The uniqueness of the forms of each of these two cereals suggests that it is unlikely either would be the second-choice substitute for the other. Rubinfeld Decl. ¶ 113 n. 76; Carroll Decl. ¶ 55(f); Parker Decl. ¶ 18.

##### 2. Grape–Nuts and Nabisco Shredded Wheat Are Associated with Different Attributes

Grape–Nuts and Nabisco Shredded Wheat emphasize different attributes in their adver-

tising. Grape–Nuts, which was once marketed as "healthy," is now marketed as "energy sustaining." Parker Decl. ¶ 19. Nabisco Shredded Wheat, on the other hand, is marketed as a "pure" cereal that contains no added sugar or salt. Parker Decl. ¶ 19.

##### 3. Grape–Nuts and Nabisco Shredded Wheat Each Compete With a Broad Array of Products

Although Grape Nuts and Nabisco Shredded Wheat are both "healthy," plain cereals, many other brands—including many of the largest brands on the market—are also promoted as healthy, plain cereals, such as Corn Flakes, Cheerios, Chex, Special K, Total, and Rice Krispies. Although Grape–Nuts and Nabisco Shredded Wheat share certain attributes, they share those attributes with a wide variety of other products. A 1986 Cereal Market Assessment survey of consumer attitudes found that 15 cereals, including Cheerios, Frosted Flakes, and Quaker Life, elicited responses similar to those elicited by Grape–Nuts and Nabisco Shredded Wheat with respect to "has a texture I especially like." Seventeen other cereals, including Froot Loops and Trix, elicited similar responses with respect to "great tasting." PX 858 at KGF 1028575, 598.

In recent years, basic RTE products, such as Grape–Nuts and Nabisco Shredded Wheat, have faced increasing competition from new, "complex" cereals. Carroll Decl. ¶ 17. These new cereals, which offer both health and taste benefits, have gained sales at the expense of plain, established products such as Grape–Nuts. From 1983 to 1991, the combined market share of Cheerios, Chex, Corn Flakes, Grape–Nuts, Nabisco Shredded Wheat, Total, and Wheaties declined from 27.7% to 21.8%. DX 155 at KGF 0216993.

Grape–Nuts purchasers are likely to be attracted to new products. For example, it is likely that Grape–Nuts lost sales to granola products during 1992, when the introduction of Kellogg's Low Fat Granola triggered competitive spending by Quaker 100% Natural and other granola products. DX 169 at KGF 0235870; DX 168 at KGF 0236896; DX 164 at KGF 0237127.

### 4. Grape–Nuts and Nabisco Shredded Wheat Each Have Direct Form Competitors

Because of their physical dissimilarities, Nabisco Shredded Wheat and Grape–Nuts are not "direct form" competitors. Each of those cereals has direct form competitors. It is likely that buyers of Grape–Nuts and Nabisco Shredded Wheat will consider the "direct form" competing cereals as their second choices. *See* Parker Decl. ¶ 15.

Currently, Grape–Nuts has two types of "direct form" competition, Kellogg's Nutri–Grain Nuggets and private label nuggets. Parker Decl. ¶ 3. Several retailers market private label nugget cereals. Boehm Decl. ¶ 27; Smith Decl. ¶ 22; Tr. at 686–87, 701 (Smith). Private label nugget cereals account for 13% of Safeway's nugget cereal sales and nearly 20% of Kroger's nugget cereal sales. Smith Decl. ¶ 22; Boehm Decl. ¶ 27. These direct form competitors pose the greatest competitive threat to Grape–Nuts because those products are specifically targeted at Grape–Nuts consumers. Parker Decl. ¶ 15. The capacity to produce more of these competitive cereals either exists or could be created relatively quickly.

Sunshine Biscuit Co. produces and markets its own branded shredded wheat RTE cereal. Smith Decl. ¶ 23; Tr. at 700–701 (Smith). Gilster–Mary Lee, a manufacturer of private label RTE cereal products since 1983, is now adding capacity to manufacturer shredded wheat cereal. DX 250A, Welge Dep. at 35–37. The retailers who testified at trial expressed interest in marketing a shredded wheat cereal product as part of their private label product lines. Boehm Decl. ¶ 28; Smith Decl. ¶ 23. Safeway is also considering adding a wheat biscuit cereal manufactured by the Weetabix Co. Kroger has told its private label manufacturers that it is interested in developing a private label shredded wheat cereal. Smith Decl. ¶ 23; Boehm Decl. ¶ 28.

### 5. Grape–Nuts and Nabisco Shredded Wheat Appeal to Different Consumers

Representatives of two of the country's largest grocery retailers, Safeway and Kroger, testified at trial that they do not consider Grape–Nuts and Nabisco Shredded Wheat to be particularly close competitors. Boehm Decl. ¶ 32; Smith Decl. ¶ 33; Tr. 1014–15 (Boehm); Tr. 644–45 (Smith). They testified that they do not make purchasing, pricing, or merchandising decisions based on any belief that Grape–Nuts and Nabisco Shredded Wheat are particularly close competitors. Boehm Decl. ¶ 33; Smith Decl. ¶ 33. They both set the retail price for Grape–Nuts independently of the price for Nabisco Shredded Wheat. *Id.*

Post demographic data indicate that Grape–Nuts consumers tend to be "upscale," younger, and more educated consumers, while Nabisco Shredded Wheat consumers tend to be "downscale," older, and less educated. DX 191; Parker Decl. ¶ 19; *see also* Thomas Decl. ¶ 93. Post's category manager for Grape–Nuts concluded from this and other data that Grape–Nuts users are not as driven by price and are more likely to accept a price increase. DX 191.

Data supplied by the Nielsen Household Panel shows that, of all households that buy Grape–Nuts and/or Nabisco Shredded Wheat, only about 20% buy both cereals. Carroll Decl. ¶ 55(c); DX 43. Grape–Nuts and Nabisco Shredded Wheat each account for a very small share of requirements among the other's consumers. In 1993, Grape–Nuts accounted for only 3.4% of cereal requirements among buyers of Nabisco Shredded Wheat cereals, while Nabisco Shredded Wheat accounted for only about 4–5% of cereal requirements among buyers of Grape–Nuts. Carroll Decl. ¶ 55(a); Parker Decl. ¶ 13; DX 27 at KGF 1166245; DX 28 at KGF 1166265–267. Stated differently, over 96% of the volume bought by buyers of Nabisco Shredded Wheat consisted of cereals other than Grape–Nuts, and about 95% of the volume bought by buyers of Grape–Nuts consisted of cereals other than Nabisco Shredded Wheat. Carroll Decl. ¶ 55(a). Even Grape–Nuts eaters who also eat Nabisco Shredded Wheat eat the latter cereal on only 3.9% of their eating occasions—*i.e.*, they eat cereals other than Nabisco Shredded Wheat 96.1% of the time. Those who eat Nabisco Shredded Wheat eat Grape–Nuts on only 4.4% of their eating occasions. Carroll Decl.

¶ 55(f); DX 36 at 14, 23. Grape–Nuts purchasers buy an average of about 15 different cereals per year, while purchasers of Nabisco Shredded Wheat buy an average of about 14 different cereals per year. Carroll Decl. ¶ 55(f); DX 42.

NET individual eater data shows that only 11.9% of those who eat Grape–Nuts also eat Nabisco Shredded Wheat; only 10.7% of those who eat Nabisco Shredded Wheat also eat Grape–Nuts. DX 36 at 19, 28. In contrast, 20.6% of those who eat Grape–Nuts— including about 16% of the adults who eat Grape–Nuts—eat some form of pre-sweetened cereal. *Id.* at 16; Carroll Decl. ¶ 55(f). Nielsen studies show that only a small proportion of Grape–Nuts volume "shifted" between 1992 and 1993 to or from Nabisco Shredded Wheat. Carroll Decl. ¶ 56; DX 57. During that time period, only about 4% of Grape–Nuts gross shifting gains and losses were attributable to Spoon Size and Big Biscuit Nabisco Shredded Wheat. Carroll Decl. ¶ 56; DX 24 at KGF 1166218.

The same data show that of all the buyers of Grape–Nuts and/or Nabisco Shredded Wheat, only 20% actually buy *both* products. Thirty-two percent purchase Grape–Nuts to the exclusion of Shredded Wheat, and 49% purchase Shredded Wheat to the exclusion of Grape–Nuts. These exclusive buyers account for about 60% of the total sales volume of Grape–Nuts and Shredded Wheat. DX 43. Committed buyers of each cereal do not switch in response to promoted prices for the other cereal. Carroll Decl. ¶ 55(c); DX 43.

A 1993 Post analysis of Grape–Nuts buyers showed that when Grape–Nuts lost volume in the West, only 14% of the losses were attributable to shifting to brands in the "simple health nutrition" segment, which includes Nabisco Shredded Wheat; the balance, 86%, went to cereals *outside* the "simple health nutrition" segment, or were attributable to decreased consumption. Carroll Decl. ¶ 51; DX 57 at KGF 1166028–29. The same study showed that *nationally*, only 28% of Grape–Nuts gross volume losses went to cereals in the "simple health nutrition" segment. Carroll Decl. ¶ 51.

Although these studies did not measure product substitutions in reaction to price changes, they indicate the extent to which two cereals are bought by the same households. To the extent that these studies can be used to identify brands that compete more directly with one another, they indicate that Grape–Nuts and Nabisco Shredded Wheat compete with a large number of other cereals. Carroll Decl. ¶ 55(b); Rubinfeld Decl. ¶ 22. Post management consults studies that measure the propensity of buyers of one cereal to buy another cereal ("interaction indices") (an interaction index over 100 implies a greater than average propensity for a household to buy both cereals). These interaction studies show that Grape–Nuts has interaction indices of over 100 with many other cereals, including the following (the interaction index number for each cereal is set forth after each cereal's brand name): Post Great Grains (168), Nabisco Big Biscuit Shredded Wheat (165), Quaker Life (145), Kellogg's Nutri–Grain (143), Quaker 100% Natural (141), Quaker Oat Bran (139), General Mills Total Raisin Bran (138), Quaker Crunchy Bran (131), plain Wheaties (129), Cracklin Oat Bran (124), Honey Gold Wheaties (118), generic corn flakes (116), Chex (115), Post Marshmallow Alpha–Bits (115), Berry Berry Kix (105), and Honey Nut Cheerios (102). Carroll Decl. ¶ 55(b); DX 27. Nabisco Shredded Wheat has a greater than 100 interaction with many other cereals, including Post Fruit & Fibre (153), Quaker Toasted Oatmeal (149), Wheat Chex (146), Quaker Oat Squares (145), All–Bran (141), Post Toasties (135), Cracklin Oat Bran (128), Special K (128), Total Raisin Bran (126), Fiber One (124), Kellogg's Just Right (124), Multigrain Cheerios (123), Crispix (122), Quaker 100% Natural (121), Wheaties (113), Quaker Life (112), Kix (111), and regular Cheerios (108). Carroll Decl. ¶ 55(b); DX 28 at 1166252–253.

## B. Grape–Nuts and Shredded Wheat Are Priced and Promoted Independently

The evidence does not support plaintiff's assertion that Post has attempted to maintain price parity between Grape–Nuts and Nabisco Shredded Wheat, or that Shredded Wheat was one of the main brands that Post

used to determine the price of Grape–Nuts, as part of a price leadership scheme.

Post generally has looked to Kellogg products, not Nabisco Shredded Wheat, as a benchmark in pricing Grape–Nuts. Leckie Decl. ¶ 49(c); Parker Decl. ¶¶ 35–38; Schena Decl. ¶¶ 16, 26–29; Rubinfeld Decl. ¶ 122; DX 196; DX 199; DX 201; DX 203; DX 207. Nabisco generally did not react to a price increase by Kellogg or General Mills until about the same time as Post. Because Nabisco used a broker sales force, it was difficult for Post to obtain accurate and timely information from retail customers about Nabisco's wholesale pricing. Parker Decl. ¶ 35; Schena Decl. ¶ 29.

During most of the 1980s, the brand marketing group for Grape–Nuts followed a wholesale pricing strategy of maintaining a set price-per-pound premium over the price of Kellogg Corn Flakes. See, e.g., DX 191 at KGF 0205241; Parker Decl. ¶ 34. For a period in 1990, the Grape–Nuts brand marketing group recommended that Post consider wholesale price increases for Grape–Nuts using as a guide the actual percentage increases on Kellogg's Corn Flakes, and estimated percentage increases on Nabisco Shredded Wheat and Ralston's Chex. DX 191 at KGF 0205238–39; Parker Decl. ¶ 35. In 1991, Grape–Nuts began to use Kellogg's line average and Kellogg's Nutri–Grain Nuggets as wholesale pricing guides. Parker Decl. ¶ 36; see also Tr. at 906 (Rubinfeld); Schena Decl. ¶ 16. Except for a brief period in 1990 when Post considered changes in the wholesale price of Grape–Nuts using Corn Flakes, Chex, and Nabisco Shredded Wheat as guides, the wholesale price benchmark for Grape–Nuts has always been a Kellogg cereal or the Kellogg RTE cereal line average. Parker Decl. ¶ 38; see also Schena Decl. ¶ 16. Neither the Grape–Nuts brand marketing group nor the Post finance department ever recommended a wholesale pricing change for Grape–Nuts based on a pricing action by Nabisco Shredded Wheat. Parker Decl. ¶ 38; Schena Decl. ¶¶ 27–29; Tr. at 1824–1826 (Parker).

The evidence does not support the contention that there was "tacit" wholesale price collusion between Grape–Nuts and Nabisco Shredded Wheat. Even had Post wanted to collude tacitly, it would have been difficult for it to do so, given that Nabisco generally did not announce its pricing actions until after Post. Parker Decl. ¶ 38; Schena Decl. ¶ 29; Rubinfeld Decl. ¶ 74(a). Nor does the evidence support plaintiff's assertion that Post tracked Nabisco Shredded Wheat's pricing, advertising and promotional activities to determine expenditures for Grape–Nuts. Parker Decl. ¶ 20; Schena Decl. ¶ 26. Major promotions, such as the Grape–Nuts "Hot" promotion that runs each January, are planned as much as a year in advance, with little or no attention given to the anticipated advertising and promotion activities of other RTE cereals. Parker Decl. ¶ 28; see also Fasano Decl. ¶¶ 14, 24. The quarterly data relied upon by plaintiff does not show whether the cereals being compared were actually receiving trade merchandising at the same time, or rather whether they received trade merchandising at different times within the same quarter.

There is no evidence that, during any relevant time period, Post attempted to "synchronize" or "coordinate" the trade promotion activities of Grape–Nuts with those of Nabisco Shredded Wheat. Parker Decl. ¶¶ 28–30. Plaintiff's contention that Grape–Nuts "cut its advertising and promotion budget" in response to Nabisco's "harvest strategy" is not supported by the evidence. Parker Decl. ¶ 21. The money spent on total advertising and promotion for Grape–Nuts increased each year from 1989 through 1992. See DX 138 at KGF 0124725; DX 140 at KGF 0346855; DX 144 at KGF 1166573–74; Parker Decl. ¶ 21. Although plaintiff points to a decline in Grape–Nuts advertising and promotion as a percent of revenue, that was simply a function of unexpectedly high sales growth in 1990. For planning purposes, the Grape–Nuts brand group erroneously assumed a 2% volume growth in 1990. In fact, the Grape–Nuts sales volume actually grew 22% in 1990. As a result, advertising and promotion expenditures declined as a percentage of Grape–Nuts net revenue. This decline was not the result of "coordination" with Nabisco Shredded Wheat. Parker Decl. ¶ 21.

C. *Post–Acquisition Pricing and Promotion of Grape–Nuts and Nabisco Shredded Wheat Does Not Support an Inference of Anti–Competitive Unilateral Effects*

Contrary to plaintiff's suggestion, Post did not pursue a strategy of raising the price of Grape–Nuts in 1993, while not raising the price of Nabisco Shredded Wheat, on the assumption that a substantial portion of the sales lost by Grape–Nuts would be obtained by Nabisco Shredded Wheat. Parker Decl. ¶ 41; Schena Decl. ¶¶ 27–28; Tr. 2097–98 (Leckie). Grape–Nuts started losing market share in the second quarter of 1992, more than six months before Post acquired the Nabisco RTE cereal business. DX 169 at KGF 0235855; Parker Decl. ¶ 41. Several Post analyses indicate that the recent Grape–Nuts share decline is mainly attributable to the ineffectiveness of its advertising copy and to a loss of sales to Kellogg's Nutri–Grain Nuggets and private label nuggets. Parker Decl. ¶ 41; DX 164 at KGF 0237119–127; DX 166 at KGF 0237000–004; DX 169 at KGF 0235862–872.

D. *Expert Opinions*

1. *Defendant's Expert's Conclusions*

Post's expert economist, Professor Daniel Rubinfeld,[7] performed an econometric analysis to determine whether Grape–Nuts and Nabisco Shredded Wheat are sufficiently close substitutes that if Post raised the price of one of them and consequently lost sales, the lost sales would be picked up by the other cereal, making a unilateral price increase a profitable strategy. He concluded that they are not. Rubinfeld Decl. ¶¶ 143, 144. I find his analyses reliable.

Professor Rubinfeld estimated retail price effects of various pricing actions, using microeconomics and regression analysis. He estimated the "own price" elasticity of Grape–Nuts and Nabisco cereals, and he estimated the cross-price elasticities of demand between Grape–Nuts and a number of RTE cereals, including Big Biscuit and Spoon Size

Nabisco Shredded Wheat. Rubinfeld Decl. ¶¶ 141, 142.

Professor Rubinfeld found the own price elasticity of demand (the effect of a change in a product's price on that product's sales volume) for Grape–Nuts to be approximately −2 (an own price elasticity of −2 signifies that a price increase of N% will result in a volume decrease of 2N%). Rubinfeld Decl. ¶ 142 and n. 95. Professor Rubinfeld found the own price elasticity of Nabisco cereals to be close to, and sometimes less (in magnitude) than, −1. Rubinfeld Decl. ¶ 142.

Professor Rubinfeld also found the cross-price elasticities of demand (the effect of a change in one product's price upon the sales volume of another product) between Grape–Nuts and both Big Biscuit and Spoon Size Nabisco Shredded Wheat to be very low. The precise amounts of the cross-price elasticities that Professor Rubinfeld found varied depending on the assumptions he made regarding advertising and marketing variables, but his calculations consistently showed that any unilateral effects are likely to be very small. His regression studies show that an increase in the price of Grape–Nuts is likely to lead to only a very small increase in sales of Nabisco Shredded Wheat cereals. Rubinfeld Decl. ¶ 143.

Professor Rubinfeld found that Grape–Nuts and Big Biscuit/Spoon Size Nabisco Shredded Wheat are not the closest substitutes for one another; he found that the cross-price elasticities of demand are higher between Grape–Nuts and a number of other cereals, including Cheerios, Kellogg's Raisin Bran, Kellogg's Frosted Mini–Wheats, the Kellogg's Nutri–Grain line, and Ralston Chex. Rubinfeld Decl. ¶ 145.

Professor Rubinfeld's econometric results are consistent with other evidence of the many differences between Grape–Nuts and Nabisco Shredded Wheat. *See, e.g.,* DX 138; DX 354; Parker Decl. ¶¶ 13, 18–19; Thomas Decl. ¶¶ 92, 93; Carroll Decl. ¶¶ 12, 29–30,

---

7. Professor Rubinfeld is an expert in the principles of microeconomics and in regression analysis. His written scholarly work in the fields of microeconomics, econometrics, and antitrust economics include a protocol sponsored by the Federal Judicial Center for federal judges on the uses of multiple regression techniques. Rubinfeld Decl. ¶¶ 1–5, 141 n. 94.

42, 45–46, 50–56; Rubinfeld Decl. ¶¶ 144, 146; Smith Decl. ¶ 70; Boehm Decl. ¶¶ 65–67.

### 2. Plaintiff's Expert's Conclusions

Plaintiff's expert economist, Professor Cotterill, testified that Grape–Nuts and Nabisco Shredded Wheat are the first and second choices of a sufficient number of RTE cereal buyers to make a unilateral price increase strategy profitable for Post. He relied on Post's shifting and interaction data to support his opinion. Those data do not support his conclusion.

Shifting studies show how much volume may have shifted between cereals, but not why the shifts occurred. Unlike estimates of cross-price elasticities of demand, shifting analyses and interaction indices do not relate changes in consumption to changes in price. Interaction indices merely measure the relative propensity of different products to be bought by the same households. Carroll Decl. ¶¶ 9, 49; Tr. at 555 (Carroll); Rubinfeld Decl. ¶¶ 22, 49(b); Tr. at 119–20, 150 (Cotterill). To the extent that such data may reveal substitutability among products, the data do not support plaintiff's contentions. Shifting analyses suggest that only between 5% and 8% of Grape–Nuts volume losses in 1993 were picked up by Nabisco Shredded Wheat. DX 1149; Tr. at 154–55 (Cotterill). Similarly, interaction indices suggest that Nabisco Shredded Wheat accounts for less than 5% of the cereal requirements of Grape–Nuts buyers. DX 27.

Professor Cotterill also relied heavily on the competitive sets of products analyzed by the Grape–Nuts and Nabisco Shredded Wheat brand marketing groups as probative that a significant number of consumers view Grape–Nuts and Nabisco Shredded Wheat as their first and second choice RTE cereals. This evidence did not support Professor Cotterill's views. Competitive sets are used to focus on a few cereals for analytical purposes; they are not intended to describe the full range of competition, nor do they necessarily represent Grape–Nuts' closest competitors. Parker Decl. ¶¶ 5, 10; see also Leckie Decl. ¶ 21.

The competitive set in which Post placed Grape–Nuts includes cereals that have product images and physical characteristics that are similar, but not identical, to Grape–Nuts. Generally, these cereals are promoted as wholesome, are made from simple grains, and are aimed at adults. DX 135 at KGF 0202415; Parker Decl. ¶ 6. The Grape–Nuts competitive set also includes cereals with a large share of the market, including Kellogg's Corn Flakes, Cheerios, Shredded Wheat, Chex and Wheaties. Parker Decl. ¶ 8. The cereals included in the Grape–Nuts competitive set change continually as new cereals are introduced and as Post learns more about consumer purchasing behavior. Parker Decl. ¶ 7. The brands that are currently tracked and analyzed by the Grape–Nuts product manager are Chex, Great Grains, Kellogg's Healthy Choice line, Nabisco Shredded Wheat, private label nuggets, Nutri–Grain and Nutri–Grain Nuggets, Quaker 100% Natural, Total, and Wheaties. DX 144 at KGF 1166555; Parker Decl. ¶ 9.

Although Nabisco Shredded Wheat is included in the Grape–Nuts competitive set, Post's marketing efforts do not focus on responding directly to Nabisco Shredded Wheat or any other particular competitor. Rather, Post designs its marketing programs around strategies, including significant levels of advertising, that have been shown to increase the sales of Grape–Nuts because of its unique product form and image. Parker Decl. ¶ 5. Those who manage Grape–Nuts devote most of their time to developing affirmative programs that emphasize Grape–Nut's strengths, rather than monitoring competitors. This is borne out in Grape–Nuts' marketing plans, where competitors are mentioned only a few times in fifty or sixty pages. See e.g., DX 138 at KGF 0124720–817; Parker Decl. ¶ 22.

Similarly, Nabisco formerly used competitive sets that included Grape–Nuts when it analyzed advertising activities, and Grape–Nuts was considered along with many other products in Nabisco's pricing decisions. Grape–Nuts was, however, considered by Nabisco to be only one of many of its cereal competitors; other competitors included other shredded products such as Sunshine Shredded Wheat, products such as Ralston Chex and Quaker Oat Squares, and other basic cereals, including Kellogg's Corn

**358**

Flakes and General Mills Total, along with a number of other cereals. Thomas Decl. ¶ 91.

Nabisco viewed Grape–Nuts as being in a different market "segment" than Nabisco Shredded Wheat. Nabisco categorized Nabisco Shredded Wheat as in its "adult" segment. DX 310 at KGF 0069534. Beginning in 1989, it placed Grape–Nuts in its "all family" segment, because Nabisco viewed Grape–Nuts as appealing to a younger group of buyers. Nabisco relied on demographic data indicating that Grape–Nuts buyers were more likely than Nabisco Shredded Wheat buyers to be young, to live in large households, and to have children at home. DX 354 at KGF 0087242; Thomas Decl. ¶ 93.

It is not appropriate to use these competitive sets or market segments to define the limits of competition or to infer the degree of price elasticities among cereals. Rubinfeld Decl. ¶ 128.

Turning to Professor Cotterill's econometric analysis, I find it too flawed to be reliable. I will mention here only a few of its flaws.

Professor Cotterill did not adequately take into account the supply responses (including changes in the volume of production of existing products and product repositioning) that would occur if there were any significant unilateral effects. If Post were considering an increase in the price of Grape–Nuts or Nabisco Shredded Wheat, it would have to take into account the likelihood that other companies would (a) increase their production of competing products, and/or (b) introduce new products that would compete directly with Grape–Nuts or Nabisco Shredded Wheat. Rubinfeld Decl. ¶ 148(a).

Professor Cotterill also assumed, contrary to the credible evidence, that an independent Nabisco would charge 66 cents a pound less (over 20% less) than the 1993 price for Shredded Wheat, would increase spending on advertising and promotion, would invest millions of dollars in new capacity, and would introduce several successful new products. Rubinfeld Decl. ¶ 148(h).

Professor Cotterill's econometric analysis of potential unilateral effects and his analysis of the relevant product market were premised on a so-called "tree structure," in which, he assumes, buyers make a fundamental distinction between "kid" and "adult" cereals. His use of that "tree structure" biased his results "in favor of the proposition he [was] proposing to test." Tr. at 2349 (Kahn); *see also* Tr. at 937–42 (Rubinfeld); Tr. at 1394–1400 (Falk).

### CONCLUSIONS OF LAW [8]

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1337(a), and Section 16 of the Clayton Act, 15 U.S.C. § 26. Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(c).

 Section 7 of the Clayton Act, 15 U.S.C. § 18, prohibits acquisitions that may have the effect of substantially lessening competition, or that may tend to create a monopoly in any line of commerce in any section of the country. To succeed on its Section 7 claim, plaintiff must prove by a preponderance of the evidence (1) the relevant product market, and (2) that the effect of Kraft's acquisition of Nabisco's RTE cereal assets may be substantially to diminish competition within that market. *United States v. Connecticut Nat'l Bank,* 418 U.S. 656, 669, 94 S.Ct. 2788, 2796–97, 41 L.Ed.2d 1016 (1974); *United States v. Phillipsburg Nat'l Bank & Trust Co.,* 399 U.S. 350, 353, 365, 90 S.Ct. 2035, 2038, 2044, 26 L.Ed.2d 658 (1970). Plaintiff has the burden of showing that the acquisition is reasonably likely to have "demonstrable and substantial anticompetitive effects." *United States v. Atlantic Richfield Co.,* 297 F.Supp. 1061, 1066 (S.D.N.Y.1969), *aff'd,* 401 U.S. 986, 91 S.Ct. 1233, 28 L.Ed.2d 527 (1971); *F.T.C. v. Coca Cola Co.,* 641 F.Supp. 1128, 1130 (D.D.C. 1986), *vacated without opinion,* 829 F.2d 191 (D.C.Cir.1987). Section 7 "deals in 'probability,' not 'ephemeral possibilities.'" *United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 622–623, 94 S.Ct. 2856, 2870, 41

---

**8.** To the extent that findings of fact are placed among conclusions of law, they should be deemed findings of fact.

L.Ed.2d 978 (1974). "[T]here must be 'the reasonable probability' of a substantial impairment of competition to render a merger illegal under § 7. A 'mere possibility' will not suffice." *Fruehauf Corp. v. F.T.C.*, 603 F.2d 345, 351 (2nd Cir.1979).

■ The court evaluates the competitive implications of the Acquisition using the same framework used by the Department of Justice and the Federal Trade Commission: the court considers whether the Acquisition is likely to substantially lessen competition by (1) enhancing the likelihood of coordinated interaction by competitors, and/or (2) placing the acquiring company in a position to unilaterally raise and maintain prices at supracompetitive levels. *See* Department of Justice and Federal Trade Commission, *Horizontal Merger Guidelines* §§ 2.1, 2.2, 62 *Antitrust & Trade Reg. Rpt.* (BNA) Special Supplement, April 2, 1992 (cited hereinafter as "Merger Guidelines").[9]

■ To determine the effect of a merger on competition, a court must begin by defining the relevant geographic and product markets. *See, United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957) ("determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because … [s]ubtantiality can be determined only in terms of the market affected").

### I. *The Relevant Market.*

■ It is undisputed, and this court finds, that the relevant geographic market is the United States. The more complex question presented here is definition of the relevant product market. The criteria relating to product market definition were set forth in the Supreme Court's decision in *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), where the court held:

The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-price elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Id.* at 325, 82 S.Ct. at 1523–24 (internal citations omitted).

Determination of the relevant product market is informed not only by relevant decisional law, but also by the Department of Justice and Federal Trade Commission Horizontal Merger Guidelines, issued most recently in 1992 (the "Merger Guidelines"). The Merger Guidelines organize the factors noted in *Brown Shoe* and its progeny in a two-step analysis. First, the Merger Guidelines call for identification of

a product or group of products and a geographic area in which it is produced or sold such that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future producer or seller of those products in that area likely would impose at least a "small but significant and nontransitory" increase in price, assuming the terms of sale of all other products are held constant. A relevant market is a group of products and a geographic area that is not bigger than necessary to satisfy this test.

*Merger Guidelines,* § 1.0. The Merger Guidelines state that a "small but significant

---

**9.** The court notes that the Merger Guidelines are helpful in providing an analytical framework for evaluating an acquisition, but that they are not binding upon the court. *F.T.C. v. PPG Indus.*, 798 F.2d 1500, 1503 n. 4 (D.C.Cir.1986); *Olin Corp. v. F.T.C.*, 1993–1 Trade Cas. (CCH) ¶ 70,-137, at p. 69,573, 986 F.2d 1295 (9th Cir.1993). As the introductory paragraphs to the Merger Guidelines point out, "it is not possible to remove the exercise of judgment from the evaluation of mergers under the antitrust laws," and "mechanical application of those standards may provide misleading answers to the economic questions raised under the antitrust laws." Merger Guidelines § 0.

and non-transitory" increase in price is generally assumed to be 5 percent, although that figure may be adjusted downward where market conditions warrant. Identification of the relevant product set as directed in the foregoing test is limited to analysis of demand in the marketplace. *Id.* The "small but significant price increase test" requires consideration of what economists refer to as "price elasticity of demand." Put another way, one must consider whether in response to the hypothetical monopolist's price increase on one product, that product will suffer a reduction in sales to other products such that the hypothetical monopolist will not find it profitable to impose the price increase. *Id.* § 1.11. If so, then the next best substitute for the first product (*i.e.*, the product that would account for the greatest value of lost demand for the first product), should be added to the relevant product group. *Id.* The Merger Guidelines suggest that one conduct the foregoing analysis, starting with the merging parties' products and proceeding product by product through the next best substitutes to identify the smallest possible product market in which a hypothetical monopolist could maintain the small but significant price increase. *Id.* § 1.0

Once one has identified the smallest possible group of products for which a hypothetical monopolist could profitably impose a small but significant and nontransitory price increase, the Merger Guidelines direct one to identify the firms that participate in the relevant market and to calculate their market shares. Whereas identification of the relevant products focuses exclusively on demand in the market, identification of the market participants involves consideration of supply in the market as well. *Brown Shoe Co., supra*, 370 U.S. at 325 n. 42, 336, 82 S.Ct. at 1524 n. 42, 1529-30 (1962); *Calnetics Corp. v. Volkswagen of America Inc.*, 532 F.2d 674, 691, *cert. denied*, 425 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976). Initially, one must identify the firms that currently produce the products in the market. *Id.* § 1.31. The Merger Guidelines also characterize as participants any firms and production capacity that, in response to a small but significant and nontransiory price increase, are likely to be devoted rapidly to production or sale of a market product without incurring significant sunk costs of entry and exit. *Id.* § 1.0 Finally, the Merger Guidelines advise calculation of market shares "for all firms (or plants) identified as market participants . . . based on the total sales or capacity currently devoted to the relevant market together with that which likely would be devoted to the relevant market in response to a 'small but significant and non-transitory' price increase." *Id.* § 1.41.

The market "need not—indeed cannot—be defined with scientific precision." *United States v. Connecticut Nat'l Bank, supra*, 418 U.S. at 669, 94 S.Ct. at 2796. Market definition is ultimately "a matter of business reality—a matter of how the market is perceived by those who strive for profit in it." *F.T.C. v. Coca Cola Co., supra*, 641 F.Supp. at 1132.

In this case, looking first to demand alone in the RTE cereal industry, the relevant product market is the entire RTE cereal industry, not the more narrowly defined "adult cereal" market proposed by plaintiff. This conclusion is supported by the court's factual findings (set forth in detail above), including the substantial overlap in consumers' demand for cereals in different marketing segments, the cereal manufacturers' varied and changing classification of cereals, and retailers' treatment of all RTE cereals as a single product category. In particular, I note the highly diversified nature of the RTE cereal industry, with over 200 brands competing for consumer attention, and no one brand capturing more than 5.5% of the market. The defining characteristic of the RTE cereal market is demand for variety. Although in their marketing efforts, cereal manufacturers define marketing categories, in which they pit their brands against other brands perceived to have similar benefits and characteristics, they also compete by striving constantly to introduce new products, to induce consumers to try cereals in all marketing categories, and to change consumer preferences. The effect of consumer demand for variety and of manufacturers' efforts both to cater to and to fuel that demand, is revealed in statistics indicating that many Americans eat cereal in several, if not all, cereal marketing categories. Among these statistics are

(1) high interaction indices between such superficially divergent cereals as Kellogg's Corn Flakes and General Mill's Berry Berry Kix, (2) age of eater data indicating that substantial numbers of adults eat "kid" cereals, and (3) switching studies revealing significant percentages of consumers shifting consumption between marketing categories. In light of the foregoing, the court can discern no clear break in the chain of substitutes among RTE cereals and no principled basis for defining the relevant product market more narrowly than all RTE cereals.

Although Dr. Cotterill's econometric analyses lead him to conclude that there is a submarket of "adult" cereals for which a hypothetical monopolist could profitably impose a small but significant and non-transitory price increase, that study suffers from several infirmities. First, I credit Dr. Kahn's expert testimony, and that of his colleague Mr. Falk, an econometrician, to the effect that Dr. Cotterill has failed to demonstrate that his "tree structure" approach to analysis of cross-price elasticities does not bias his results. Second, by Dr. Cotterill's own admission, although the cereals grouped together in his proposed adult market satisfy the letter of the Merger Guidelines' five percent test, there may be other groupings of RTE cereal brands that would also pass muster. For example, Dr. Cotterill's "adult" market includes "Wheaties" and excludes "Honey–Nut Cheerios," but an "adult" market that excludes "Wheaties" and includes "Honey–Nut Cheerios" might also satisfy the Merger Guidelines. Examined from this standpoint, Dr. Cotterill's "adult" market is arbitrary. Such a formalistic application of the Merger Guidelines is illogical (Tr. 2342–43 [Kahn]), and contrary to this court's understanding of the antitrust laws. Accordingly, the court finds that the relevant product market is the entire RTE cereal market.

This conclusion is reinforced by the court's consideration of supply substitutability in the RTE cereal industry. Whether assessed as part of market definition (as is suggested by decisional law) or as a separate exercise in identifying market participants (as is directed by the Merger Guidelines), evidence of supply substitutability supports a conclusion that the relevant market is all RTE cereals, rather than some sub-group of RTE cereals. Although advertising and promotional costs may impede swift entry by new brands, supply substitution through line extensions of existing brands (e.g., introduction of Frosted Cheerios) or switches in production of companion brands (e.g., switching production of Frosted Flakes to Corn Flakes) could be swift and of sufficient magnitude to be competitively significant. *See supra*, at 21–24.

## II. *Market Shares and Industry Concentration.*

■ The starting point for the court's analysis of the likely effect of the Acquisition on competition in the RTE cereal market is consideration of the level of and trend toward economic concentration in that market. *See Stanley Works v. F.T.C.*, 469 F.2d 498, 503 (1972). As the Court said in *Brown Shoe*:

■ Statistics reflecting the shares of the market controlled

by the industry leaders and the parties to the merger are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history and probable future— can provide the appropriate setting for judging the probable anticompetitive effect of the merger.

*Brown Shoe*, 370 U.S. at n. 38, 82 S.Ct. at n. 38; *see also United States v. General Dynamics Corp.*, 415 U.S. 486, 496–501, 94 S.Ct. 1186, 1193–96, 39 L.Ed.2d 530 (1974). In this regard, the Merger Guidelines advise consideration of the Herfindahl–Hirschman Index ("HHI") of market concentration. The HHI is calculated by summing the squares of the individual market shares of all the participants. The Merger Guidelines establish criteria for assessing the HHI of an industry and the incremental change in the HHI caused by a given Acquisition. Industries with an HHI less than 1000 are considered unconcentrated, those with an HHI between 1000 and 1800 are characterized as moderately concentrated, and those with an HHI over 1800 are viewed as highly concentrated. *Id.* § 1.5. The parties agree that the HHI attributable to the RTE cereal industry (both pre-merger and post-merger) falls in the third range. In such industries, with HHIs

that put them in the highly concentrated range, mergers that result in an increase in the HHI of less than 50 points are considered unlikely to have adverse competitive effects; mergers resulting in an incremental increase in the HHI of more than 50 but less than 100 points potentially raise significant competitive concerns, depending on other factors; and those yielding an increase in the HHI of more than 100 points are presumed to be likely to create or enhance market power or facilitate its exercise. *Id.* § 1.51(c).

█ In this case, the court finds concentration in the market sufficiently high to give rise to potentially significant competitive concerns, depending on the presence, if any, of anti-competitive effects, discussed *infra*. This conclusion is based on evidence relating to market shares at the time of the Acquisition in January 1993, but also gives some consideration to evidence of market structure and behavior thereafter.[10] Kraft urges the court to look only to pre-acquisition market shares. Dr. Kahn recommended that approach, noting his concern that reference to post-acquisition data (1) would effectively tax the merger for Kraft's successful management of the Nabisco assets, and (2) could create incentives for firms to mask the effects of a merger while the transaction is under judicial scrutiny. The court credits these concerns, but also gives some consideration to post-acquisition evidence to the extent that it is probative of the probability of any future lessening of competition. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 505 & n. 13, 94 S.Ct. 1186, 1197 & n. 13, 39 L.Ed.2d 530 (1974) ("section 7 was designed to arrest the creation of monopolies '"in their incipiency"' and '"incipiency"' ... denotes not the time the stock was acquired, but any time when the acquisition threatens to ripen into a prohibited effect"). Pre-acquisition data indicates that the Acquisition results in Kraft/Nabisco controlling 14.52% of a market in which the top four firms have 83.49%. Put in terms of the HHI, these data indicate that the Acquisition yields an incremental increase in the HHI of 66 points in a market with an overall post-

**10.** Relevant market share statistics are set forth below:

RTE Market Shares and HHIs

| Company | 1992 | 1993 | 9–10–94 (52 weeks) | 9–17–94 (Cal. Yr.) |
|---|---|---|---|---|
| Kellogg's | 37.03 % | 36.63 % | 35.65 % | 35.20 % |
| Gen. Mills | 25.12 % | 24.24 % | 23.70 % | 23.21 % |
| Kraft/Post | 11.70 % | 12.11 % | 12.74 % | 13.35 % |
| Quaker | 6.82 % | 7.06 % | 7.97 % | 8.18 % |
| Ralston | 4.58 % | 4.18 % | 3.86 % | 3.54 % |
| Nabisco | 2.82 % | 2.94 % | 3.25 % | 3.34 % |
| Priv. Lab. | 8.52 % | 9.03 % | 8.79 % | 9.01 % |
| Other | 3.40 % | 3.80 % | 3.57 % | 4.15 % |
| Post/ Nabisco | 14.52 % | 15.05 % | 16.00 % | 16.70 % |
| Top 4 Firms (see below) | 83.49 % | 82.98 % | 83.32 % | 83.29 % |
| HHI Effect of Merger | 66 | 71 | 83 | 89 |
| Post–Acq. HHI | 2281 | 2223 | 2168 | 2137 |

For purposes of analysis, the "top 4 firms" category in this chart treats Kraft and Nabisco as one firm. Thus, the percentages shown in this category include the market shares of Kellogg's, General Mills, Kraft/Post, Quaker and Nabisco. Because the Acquisition took place in early 1993, the "top 4 firm" figure for 1992 is a hypothetical one, reflecting the share the top four firms would have had if Nabisco had been part of Kraft in 1992.

acquisition HHI of 2281. Looking to the post-acquisition data, the market share attributable to the combined Kraft/Nabisco firm has increased from 14.52% in 1992 to 15.05% in 1993; to 16.00% in the 52 weeks ending September 10, 1994; and to 16.70% in the first eight and a half months of 1994. Accordingly, calculation of the incremental effect on the HHI attributable to the Post/Nabisco merger based on these post-acquisition market shares indicates that it increases from 66 points based on 1992 figures to 89 points based on year-to-date data for 1994. Nonetheless, the market share of the top four firms has remained relatively constant over this period, a function of a decline in the shares held by Kellogg's and General Mills. Similarly, industry concentration as reflected in the HHI has declined over this period, the result of both decreases in shares controlled by Kellogg's and General Mills, and increases in shares controlled by the relatively smaller Kraft/Nabisco, Quaker, and private label manufacturers. Thus, although calculation of Post/Nabisco market shares and the incremental HHI based on post-acquisition data indicates that the merger could have a more detrimental effect than is revealed by the 1992 figures, post-acquisition data on the overall industry indicate that the merger coincides with a long term trend of reduced concentration in the RTE cereal industry.

The State argues that Kraft/Nabisco's current market share underestimates the competitive significance of the Nabisco RTE cereal assets. The State claims that from late 1989 through 1992, Nabisco pursued a cash maximization policy, or "harvest strategy," pursuant to which it reduced marketing expenditures and increased prices to maximize short-term profits. The State maintains that this strategy produced a decline in Nabisco's market share from 4.89% in 1989 to 2.82% in 1992, which could be reversed by restoring pre-harvest pricing and marketing efforts. The State urges the court to find that an independent Nabisco could regain its 1989 4.89% market share, and even obtain a 5.52% market share by 1998; if the court were to rely on these figures, the HHI change result-

ing from the Acquisition would be greater than 100 points, and thus that the Acquisition will be presumed to create or enhance market power or facilitate its exercise. The court rejects the State's arguments, based on the court's factual findings at pp. 31–47 *supra*, and has found that Nabisco's 1992 market share of 2.82% is the correct measure of its competitive significance. Even if the court were to accept the proposition that the recent history of the Nabisco cereal business warrants some adjustment of its market share, the court would not accept the State's proposed adjustment. The court bases this conclusion on its review of evidence indicating that (1) Nabisco's loss of market share was partially attributable to market factors other than its harvest strategy, and (2) regaining market share in the RTE market industry is extremely difficult, requiring substantial investments in advertising and promotion. The court concludes that even if it were to adopt the bulk of plaintiff's unduly optimistic assumptions (which the court does not adopt), it would be unreasonable to attribute to Nabisco a market share greater than its 1989 market share of 4.89%, and that it would be far more reasonable to attribute to Nabisco a market share closer to its 1994 year-to-date market share of 3.34%. Even if the court were to adopt either of the latter market share adjustments to Nabisco's market share, the court would find that the market share and market concentration data concerning the RTE cereal industry does not create a presumption that the Acquisition violates Section 7 of the Clayton Act. The court concludes, however, that the Acquisition raise potentially significant antitrust concerns that must be evaluated in light of other evidence relating to competitive effects.

### III. *Likelihood of Anticompetitive Effects*

#### A. *Facilitation of Anticompetitive Coordinated Conduct*

Courts enforcing Clayton Act Section 7 focus on whether the acquisition will facilitate anticompetitive coordinated conduct, that is, whether the acquisition will make it "easier for the firms in the market to collude, expressly or tacitly, and thereby

force price above or farther above the competitive level." *Hospital Corp. of America v. F.T.C.*, 807 F.2d 1381, 1386 (7th Cir.1986), *cert. denied,* 481 U.S. 1038, 107 S.Ct. 1975, 95 L.Ed.2d 815 (1987). The State contends that the Acquisition is likely to substantially lessen competition by increasing anticompetitive coordinated conduct in an industry where, it claims, anticompetitive coordinated conduct already exists. Manufacturers of RTE cereal, with minor but growing exceptions, compete largely through new product introductions, advertising, couponing and trade allowances. The State is critical of these forms of competition, claiming, among other things, that they are wasteful and inefficient means of delivering products to consumers, that they erect barriers to new entrants, and that they are used to the exclusion of price competition in the form of "everyday low prices." Professor Kahn was also critical of the ways in which participants in this industry compete. Tr. at 2378–2379 (Kahn). The State contends that competition has been limited to these forms as a result of "collusion" among the large manufacturers. The State produced no evidence of explicit collusion, and appears to rely heavily on evidence that the two manufacturers with the largest market shares are "leaders" in taking price-related actions, that other manufacturers generally follow the "leaders," and that all of the manufacturers act with a recognition of their interdependence, which causes them to avoid the price-depressing practice of selling at "everyday low prices," and causes them instead to rely almost exclusively on the other forms of competition noted above. The record does not support plaintiff's contention that the forms competition has taken in the RTE cereal industry result from collusion rather than from independently determined conduct.

The State contends that any time that you reduce the major sellers in a market from six to five, you increase the likelihood of anticompetitive coordinated conduct. This view reflects economists' conventional wisdom; as Dr. Kahn stated:

> As a general proposition, I, along, I believe, with a great majority of economists, subscribe to the proposition that the more highly concentrated a market is, the greater the likelihood sellers will avoid direct and open everyday low price competition, whether through overt collusion or conscious parallelism or mere recognition of oligopolistic interdependence, and the greater the likelihood price competition will take the form, especially in consumer goods industries of special promotions, the offer of coupons, both of which of course are extremely prevalent in this industry, and the greater the likelihood, also, that it will take the form of cost-inflating advertising, which of course is again very important in this industry, the form of product differentiation and the continuous offering of product variations. (Tr. 2372–2373)

The court must consider here whether the increase in concentration that results from this Acquisition is, in fact, likely to lessen competition. This requires the court to consider two scenarios offered by the State as more competitive than the scenario produced as a result of the Acquisition: first, the State urges a return of the Nabisco RTE cereal assets to Nabisco, who, the State hopes, might decide both to resume manufacturing RTE cereal and to be an industry "maverick"; second, the State points out that Nabisco could sell these assets to a new entrant ("Newco"), who, the State believes, would find it in its interest to be more of an industry maverick than Kraft.

The State has not proven that either of the scenarios it posits is likely. Nabisco sold these assets because it no longer wanted to be in the RTE cereal business. Even if it were to change its mind (and there is no evidence suggesting that Nabisco is likely to change its mind), there is no reason to believe that Nabisco would be an industry "maverick," or that it would conduct itself differently from Kraft in its competitive behavior. When Kraft acquired the Nabisco RTE cereal assets, Kraft used them to improve the competitive position of the Nabisco RTE cereals. There is no reason to believe that Nabisco is likely to compete differently from, or more effectively than, Kraft, if the Nabisco RTE cereal assets were transferred to Nabisco. *See* Tr. at 2373–2379 (Kahn). In the past, Nabisco was no maverick. In-

stead, it followed the same competitive practices as its larger competitors; it did not engage in "everyday low pricing," and it chose not to undercut its own brand by producing product for private label distribution.

There is also no reason to believe that a Newco would choose to compete any differently or any more effectively than Kraft. The State considers it important for any Newco to have the use of the Nabisco name for a transition period, to maintain consumer acceptance. As Dr. Kahn pointed out, Newco will presumably pay a high price for the right to use that name during a transition period, and, having done so, is likely to be disinclined to undercut its brand name by offering its product for private label distribution. (Tr. 2378) There is also no reason to believe that any Newco will choose to compete by any means different from those that have proved successful for the largest firms in the industry, *i.e.*, product innovation, brand differentiation, and more effective advertising, couponing and other promotional efforts.

B. *Promotion of Anticompetitive Unilateral Effects*

■■■ The State contends that, even absent any consideration of coordinated effects, the Acquisition is unlawful because it promotes anticompetitive unilateral effects, *i.e.*, by placing Shredded Wheat and Grape Nuts under one roof, the Acquisition diminishes the likelihood that there will be competition between the two brands, which the State contends are very close substitutes for one another. The Merger Guidelines recognize the danger of anticompetitive unilateral effects, pointing out (put most simply) that a merged firm may be able to raise the price of one product and capture any sales lost due to that price rise, if buyers will switch to another product that is now sold by the merged firm. As the Merger Guidelines note, a firm can wield such power (*i.e.*, achieve substantial unilateral price elevation) in a market for differentiated products only if there is

"a significant share of sales in the market accounted for by consumers who regard the products of the merging firms as their first and second choices, and that reposi-

tioning of the non-parties' product lines to replace the localized competition lost through the merger [is] unlikely." Merger Guidelines Sec. 2.21.

Although courts do not invariably concern themselves with unilateral effects in Section 7 cases, I will assume, arguendo, that the Merger Guidelines' concern for this effect is valid. The Merger Guidelines direct us to the following sources for information regarding which product is a second choice to another product: "marketing surveys, information from bidding structures, or normal course of business documents from industry participants." Merger Guidelines Sec. 2.211 n. 22. The Merger Guidelines acknowledge that where products are differentiated, it may be difficult to assess the extent of the likely competitive effect from a unilateral price elevation, and state that the market shares of the merging firms may be indicative of the magnitude of the effect, where "each product's market share is reflective of not only its relative appeal as a first choice to consumers of the merging firms' products but also its relative appeal as a second choice" (which we learn from the afore-mentioned marketing surveys and industry participants' business documents, *inter alia* ). Id. Sec. 2.211. Where that is the case, and where market concentration data falls outside the safeharbor provisions of Section 1.5 of the Guidelines, the Guidelines urge the use of a "thirty five percent" test:

> Where market concentration data fall outside the safeharbor regions of Section 1.5, the merging firms have a combined market share of at least thirty-five percent, and where data on product attributes and relative product appeal show that a significant share of purchasers of one merging firm's product regard the other as their second choice, then market share data may be relied upon to demonstrate that there is a significant share of sales in the market accounted for by consumers who would be adversely affected by the merger. *Id.*

In addition, the Merger Guidelines counsel that if rival sellers are likely to replace any localized competition lost through the merger by repositioning their product lines, then a

merger is not likely to lead to unilateral price elevation of differentiated products. Id.

Here, industry participants' business documents and consumer surveys present conflicting data concerning whether Grape Nuts and Shredded Wheat are viewed as first and second choices to one another by a significant share of purchasers of either of the two products. There is, however, substantial evidence that the two cereals are not regarded as first and second choices by a significant number of consumers. As Dr. Kahn pointed out, although Post documents show that Post has linked the price of Grape Nuts to that of Shredded Wheat, among several other brands, and interaction indexes used in Post's business show that Grape Nuts and Shredded Wheat can be viewed as at or near the top of each other's list of most direct competitors, they are so different in physical form and texture that two of the large RTE cereal manufacturers who make a nugget product, Kraft and Kellogg's, have gone to great lengths to add a shredded wheat cereal to their lines. Weighing this and all of the other evidence presented at trial on this issue, I find that the State has failed to demonstrate that a "significant" number of consumers regard the products of the merging firms as their first and second choices.

The parties also presented extensive evidence concerning the pricing of the two products pre-Acquisition and post-Acquisition to show whether or not an anticompetitive unilateral effect was discernable post-Acquisition. As Dr. Kahn pointed out, pricing changes from 1989 through 1994 show no relationship in the behavior of the two products that would suggest anticompetitive unilateral effects. (Tr. 2383–4). Finally, as Dr. Kahn pointed out, even if we were to adopt Prof. Cotterill's market definition, the sum of the market shares for Grape Nuts and Shredded Wheat were well below the thirty-five percent level, Tr. at 2383 (Kahn), suggesting that market share data alone does not support the State unilateral effects contention.

The foregoing demonstrates that it would not be profitable for Kraft to raise the price of Grape Nuts in the expectation that a substantial portion of its lost sales would go to Nabisco Shredded Wheat, because it is likely that the lost sales would be dispersed among a wide variety of products, and that Nabisco Shredded Wheat would gain only a small percentage of those losses. The State has failed to prove its claim of adverse unilateral effects.

### CONCLUSION

Plaintiff has not shown by a preponderance of the evidence that Kraft's acquisition of the former Nabisco RTE cereal assets is likely to have the effect of substantially diminishing competition in a relevant product market in violation of Section 7 of the Clayton Act. Accordingly, the court directs the entry of judgment in favor of defendants Kraft and Nabisco.

SO ORDERED.